[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
OCTOBER 27, 2009
THOMAS K. KAHN
CLERK

_____

No. 08-13332

_____

D. C. Docket No. 07-00135-CV-1-SPM-AK

BETA UPSILON CHI UPSILON CHAPTER AT THE
UNIVERSITY OF FLORIDA, a student organization
at the University of Florida on behalf of
itself and its individual members,
BETA UPSILON CHI, INC., a Texas non-profit
corporation,

Plaintiffs-Appellants,

versus

J. BERNARD MACHEN, in his official capacity
as President of the University of Florida,
PATRICIA TELLES-IRVIN, in her official capacity
as Vice-President for student affairs,
EDDIE DANIELS, JR., in his official capacity as
Execuvit Director of the J. Wayne Reitz Union,
CHRIS CUPOLI, in his official capacity as the
Director of Student Involvement,
CARLOS ALFONSO,
C. DAVID BROWN, II, et al.,

Defendants-Appellees.

Appeal from the United States District Court
for the Northern District of Florida

(October 27, 2009)
As Amended December 7, 2009

Before TJOFLAT, EDMONDSON and HILL, Circuit Judges.

TJOFLAT, Circuit Judge:

Beta Upsilon Chi a/k/a Brothers Under Christ ("BYX") is a Christian fraternity.[1] In 2007, the University of Florida ("UF" or "University") denied BYX official recognition because of its refusal to adhere to UF's nondiscrimination policy. BYX thereafter brought this action for declaratory and injunctive relief against the University[2] claiming that UF, by requiring it to comply with the nondiscrimination policy as a condition of recognition, had infringed its First and Fourteenth Amendment rights of association, freedom of speech, and free exercise of religion. After filing its complaint, BYX moved the district court to enter a preliminary injunction forcing the University to recognize it as a registered student

---

[1] The parties have used the acronym "BYX" throughout. The three Greek symbols represent to Beta Upsilon Chi, respectively.

[2] BYX sued the University's President and University officials purportedly involved in the refusal to grant it recognition. We refer to the defendants collectively as the University or UF.

organization.  The district court denied the motion, <u>Beta Upsilon Chi v. Machen</u>, 559 F. Supp. 2d 1274 (N.D. Fla. 2008), and this interlocutory appeal followed.[3] UF has amended its nondiscrimination policy and has allowed BYX to register. Accordingly, UF moved this court to dismiss the appeal as moot.  BYX opposes the motion.  Satisfied that the controversy at issue has ended, we dismiss the appeal as moot.

## I.

### A.

BYX is a national fraternity founded in 1985.  It has twenty-two chapters in nine states.  According to its constitution, it "exists for the purpose of establishing brotherhood and unity among college men based on the common bond of Jesus Christ."  BYX espouses a strict approach to the Christian faith, and membership in the fraternity is contingent upon what the fraternity deems "a credible profession of faith in Jesus Christ."  This requires agreement not only with the traditional core Christian beliefs and values contained in such ancient expressions as the Nicene Creed, but adherence to a demanding view of the faith.  In its doctrinal statement, BYX explains that members must "believe that the Bible is God's written revelation to man, that it is inspired, authoritative, and without error in the

---

[3]  We have jurisdiction to entertain this appeal under 28 U.S.C. § 1292(a)(1).

3

original manuscripts." Accordingly, BYX bars non-Christians[4] from membership.

BYX also demands moral and "sexual purity." According to its code of conduct, BYX believes that "sex is a gift of God to be enjoyed inside the covenant of marriage between a man and a woman. Therefore, we will not condone such activity as homosexuality, fornication, or adultery."[5]

Persons seeking membership in the fraternity are interviewed by a panel of at least three chapter officers. The officers ask the applicant a series of questions about his Christian beliefs and willingness to agree with and adhere to BYXs statement of faith, purpose, and code of conduct. An applicant is admitted as a pledge only after all presiding chapter officers agree the applicant has demonstrated an agreement with BYX's viewpoint on the Christian faith and a willingness to conform to the organization's code of conduct.

After admission into the fraternity as a pledge, the applicant must complete the pledge process. The purpose of the pledge process is to examine the applicant's understanding of salvation, his personal relationship with Jesus Christ, and his willingness to accept and promote BYX's doctrine. As part of the process, the pledge must participate in BYX's "Big/Little Brother Program" and is assigned

---

[4] BYX considers Mormons and Seventh Day Adventists non-Christians.

[5] This rule applies to all homosexuals irrespective of whether they have ever engaged in homosexual conduct.

to an active member of the fraternity who serves as the pledge's "Big Brother."

The Big Brother is required to watch over the pledge and ensure that he is

conducting himself in conformity with the fraternity's code of conduct.

Ideological, theological, and moral purity are central elements of BYX's

foundational purpose, and the "Big Brother" program is designed as a safeguard

against the pledge going astray. As BYX's constitution states,

> BYX has fulfilled its purpose over the years, and Satan hates it. He wants to sift this group like wheat and is roaming on [ ] campus like a roaring lion waiting for the chance to destroy us. If the devil sifts our group, he will probably do it primarily through alcohol, but also through sexual impurity or lust, pride, laziness, and contention. So be on your guard.

The "Big Brother" is the first line of defense against such impurities and

influences infiltrating the group.

After completing the semester-long pledgeship, the pledge becomes a

member of the fraternity. He is then eligible to stand for election to chapter officer

positions, vote for chapter officers, serve as a "Big Brother" who can mentor and

hold others accountable to the moral standards established by the group, and

participate in the general business of the organization.

All BYX members and pledges participate in Cell Groups, which are weekly

meetings where the members and pledges hold one another accountable to living

5

consistently with BYX's Christian beliefs and values. BYX also holds weekly meetings, which include prayer, worship, encouragement of specific members, a testimony or Bible message from a fraternity member, and announcements pertaining to fraternity business.

B.

The University of Florida permits and encourages student organizations to undergo its registration process and become Registered Student Organizations ("RSOs"). According to the Student Organization Handbook ("Handbook"), "[s]tudent organizations are an essential part of the University of Florida community and are an integral part of the total academic program. Such organizations foster valuable experiences for students that lead to significant learning and development and create a sense of belonging."

Currently, more than 750 UF student groups are RSOs. There are sixty religious RSOs, of which forty-eight are Christian.

UF's Center for Student Activities and Involvement ("CSAI") is responsible for registering student organizations. To become an RSO, a group must complete registration paperwork with the CSAI and fulfill certain requirements (e.g., select a unique name, describe the group's purpose and activities, and have at least three members). The primary benefits of RSO status are eligibility to apply to the

6

Student Government for funding and priority use of some facilities. RSOs are also afforded a number of channels through which they can communicate with the campus community. These include (1) advertising in the highly trafficked J. Wayne Reitz Union; (2) participating in the annual Student Organizations Fair; (3) staffing an information table in front of the Union; (4) appearing in lists of student organizations in UF publications, including UF's website and hard copy publications; and (5) establishing an organizational website and e-mail address.

A student group may also choose to forego the registration process and exist as a non-registered group. While not afforded the full range of benefits of an RSO, a non-registered group may nevertheless use campus facilities, distribute literature on campus, verbally express its views on campus, and recruit new members.

UF requires that RSOs abide by the University's nondiscrimination policy, as derived from UF Regulation 6C1-1.006(1) available at http://regulations.ufl.edu/chapter1/1006.pdf. (the "Policy" or "Handbook Policy"). The Policy states that UF "is committed to non-discrimination with respect to race, creed, color, religion, age, disability, sex, sexual orientation, marital status, national origin, political opinions or affiliations, and veteran status" and states that

7

"[t]his commitment applies in all areas," including "to students." The Handbook explains the application of the Policy to RSOs:

> A registered student organization may not discriminate against a member or prospective member on the basis of race, color, religion, sex, national origin, ancestry, age, marital status, disability, unfavorable discharge from the military, or status as a disabled veteran or veteran of the Vietnam era, except as specifically exempted by law. Likewise, among the individual discrimination prohibited by the University policy, but not by law, is sexual orientation.

Unlike non-registered groups, RSOs must have a constitution to demonstrate compliance with basic registration requirements. As of the 2008-09 academic year, each RSO constitution must contain the following statement:

> In compliance with the University of Florida Non-Discrimination Policy (Regulation 6C1-1.006) [Name of organization] will not discriminate on the basis of race, creed, color, religion, age, disability, sex, sexual orientation, marital status, national origin, political opinions or affiliations, and veteran status, national origin, political opinions or affiliations, and veteran status as protected under the Vietnam Era Veteran's Readjustment Assistance Act.

Under the Handbook Policy, an RSO may not exclude a student from membership based upon his or her religious beliefs. "However, when an RSO selects its leaders it may consider whether the views of an officer candidate reflect those of the organization." UF provides student groups a guidance document, which offers the following as a permissible sample provision that may also be included in an RSO constitution: "Only an individual whose interests, views, and

8

knowledge align with our organization's religious purpose is eligible to run for office, as specified in our By-laws."

C.

On March 16, 2007, BYX founded a chapter at UF[6] and thereafter requested the University to register the chapter so that it could receive the full range of benefits enjoyed by RSOs. On May 17, 2007, the University denied BYX's request on the ground that because the fraternity would not allow women to join, BYX was in violation of the Policy's prohibition against sex discrimination. In response, BYX brought this lawsuit on July 10, 2007, seeking declaratory and injunctive relief against the University under 42 U.S.C. § 1983[7] on the ground that its refusal to register BYX's chapter has denied the chapter rights guaranteed by the First and Fourteenth Amendments.

---

[6] The chapter is officially called Beta Upsilon Chi, Upsilon Chapter. At the time the district court heard BYX's application for a preliminary injunction, the chapter had seven members.

[7] Section 1983 of Title 42 of the United States Code states, in pertinent part:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

After the University responded to its complaint, BYX located and formally affiliated its chapter with a sorority, Theta Alpha. The University concluded that the affiliation with Theta Alpha satisfied its concern over sex discrimination but nevertheless denied the chapter registration because BYX refused to state in its constitution that it would not discriminate on the basis of creed or religion. The University determined that BYX's stringent membership requirements amounted to "religious" discrimination in violation of the Handbook Policy.

On October 4, 2007, BYX amended its complaint to address UF's new rationale for denying registration.[8] The amended complaint contained five counts, all based on the University's refusal to afford the fraternity full RSO status and asserting a violation of First Amendment rights. Count I alleged that the refusal infringed the fraternity's right to freedom of expressive association. Count II alleged infringement of the right to freedom of intimate association. Count III alleged infringement of the right to free speech. Count IV alleged infringement of the right to free exercise of religion. Count V alleged that the University was denying the fraternity equal protection of the laws in violation of the Fourteenth Amendment. For relief, in addition to a declaration that UF had infringed its

---

[8] This was BYX's second amended complaint. BYX filed its first amended complaint on August 15, 2007.

10

rights as asserted in these counts, BYX sought a preliminary and permanent injunction ordering UF to grant its chapter "Registered Student Organization status; and prohibiting [UF] . . . from withholding the rights, privileges, benefits, or incidents of registered status from BYX and from retaliating against [BYX] and its members directly or indirectly for exercising their constitutional rights."

On October 17, BYX filed a motion for preliminary injunction. In its motion, BYX claimed that because UF had denied its chapter RSO status during Fall Rush, it was unable to advertise or host any of its rush meetings or activities on campus. As a result, the chapter was only able to recruit three new pledges, whereas other Christian fraternities were able to recruit substantially greater numbers. It asked the court to provide injunctive relief to ensure the fraternity would be able to attain RSO status and thereby fully participate in Spring Rush. As for the legal basis of the motion, BYX asserted that it was unconstitutional (and illogical) to create a public forum that includes organizations organized around specific religious principles but not allow those organizations to accept or exclude members based on that faith. It also claimed that UF's enforcement of its nondiscrimination policy was designed to induce BYX to alter its membership standards and force it to abandon its core beliefs. This, according to BYX, would

11

unduly and unconstitutionally burden its members' ability to express their beliefs and give effect to the fraternity's stated purpose.

The University opposed BYX's motion, arguing that BYX was not hindered in its recruitment efforts on account of the status of its chapter as an unregistered organization. It claimed that the chapter was able to communicate with UF students during Fall Rush by advertising itself in student areas and by using online social networking sites like Facebook. The University also pointed out that the chapter was able to use the Orange and Brew coffee shop, located on campus, for its weekly Cell Groups, and noted that it had held several events around campus and had participated in intramural sports. The University also claimed that BYX had mischaracterized the case as a forced inclusion case. It argued that it had not forced BYX to include unwanted members; instead, UF claimed that it had simply conditioned the fraternity's registration as an RSO—which would allow the chapter to apply for funding and provide it with priority access to facilities and channels of communication—on compliance with UF's nondiscrimination policy.

On May 29, 2008, over seven months after BYX filed its motion for a preliminary injunction, the district court entered an order denying the motion. In its order, the court rejected BYX's expressive association and viewpoint discrimination claims. The court found no evidence that the Handbook Policy

12

would "significantly affect BYX's ability to express itself—publicly or privately."

Machen, 559 F. Supp. 2d at 1278. The court also found "no evidence that the mere presence of non-Christians [in BYX] will prevent the other members from fostering unity and encouraging each other in their Christian walk." Id. As for BYX's viewpoint discrimination claim, the court noted that UF had registered numerous Christian organizations, but, unlike BYX, these Christian organizations had agreed to comply with the University's nondiscrimination policy. This fact alone, in the court's view, demonstrated that viewpoint discrimination "was not the rationale for UF's decision." Id. at 1280.

On June 6, 2008, BYX filed a notice of appeal challenging the district court's May 29 order, and moved this court for an injunction pending appeal. On July 30, a panel of this court entered an order granting BYX's motion and an injunction issued.[9]

## II.

On January 15, 2009, after we heard oral argument, the University announced that it had modified the Handbook Policy relating to the registration of

---

[9] The panel issued the injunction after considering four factors: (1) whether the movant was likely to prevail on the merits of its appeal; (2) whether, if the injunction did not issue, the movant would suffer irreparable harm; (3) whether, if the injunction issued, any other party would suffer substantial harm; and (4) whether an injunction would serve the public interest. See In re Grand Jury Proceedings, 975 F.2d 1488, 1492 (11th Cir. 1992).

student organizations and had registered BYX as an RSO. The Handbook Policy, as modified, provides:

> Student organizations that wish to register with the Center for Student Activities and Involvement (CSAI) must agree that they will not discriminate on the basis of race, creed, color, religion, age, disability, sex, sexual orientation, marital status, national origin, political opinions or affiliations, or veteran status as protected under the Vietnam Era Veteran's Readjustment Assistance Act.
>
> <u>A student organization whose primary purpose is religious will not be denied registration as a Registered Student Organization on the ground that it limits membership or leadership positions to students who share the religious beliefs of the organization. The University has determined that this accommodation of religious belief does not violate its nondiscrimination policy</u>.

(the "modified Policy") (emphasis added). This statement is in effect and is reflected in the CSAI Handbook of Activities and CSAI's registration and constitution guidelines and website.

Under the modified Policy, the BYX chapter is considered a "student organization whose primary purpose is religious." Thus, the fact that BYX "limits membership or leadership positions to students that share the religious beliefs of the organization" is no limitation to registration as an RSO. Accordingly, the fraternity, having been duly registered as an RSO, now enjoys the same benefits offered to all other RSOs at the University. Given this turn of events, the University moved this court to dismiss this appeal for mootness.

BYX is not satisfied with this result, however, and urges us to reach the merits of its constitutional claims. It ardently presses us to retain jurisdiction over this case because the University has failed to change the regulation from which the CSAI Handbook nondiscrimination policy derived: UF Regulation 6C1-1.006(1) (the "Regulation"). Furthermore, BYX is troubled by UF's timing. It contends that "the timing of [UF's] motion to dismiss [this appeal] indicates that it is motivated not by a genuine change of heart but rather by a desire to avoid liability." We are not concerned with UF's motivation for changing its registration policy, but only with whether a justiciable controversy exists. Finding that BYX has received the relief sought in its complaint, we reject its request that we reach its constitutional claims and dismiss this case, as we no longer possess jurisdiction.

The Constitution confines the jurisdiction of the federal courts to actual "Cases" or "Controversies." U.S. Const. art. III, § 2, cl. 1. This prerequisite must be satisfied at each stage of the litigation. See Spencer v. Kemna, 523 U.S. 1, 7, 118 S. Ct. 978, 140 L. Ed. 2d 43 (1998); Roe v. Wade, 410 U.S. 113, 125, 93 S. Ct. 705, 35 L. Ed. 2d 147 (1973); Coral Springs St. Sys., Inc. v. City of Sunrise, 371 F.3d 1320, 1327 (11th Cir. 2004). Because this requirement is foundational and "goes to the heart of our constitutional doctrine of the separation of powers

15

and the proper role of the judiciary," sound practice counsels that we begin our inquiry there. Troiano v. Supervisor of Elections in Palm Beach County, Fla., 382 F.3d 1276, 1282 (11th Cir. 2004). See also City of Erie v. Pap's A.M., 529 U.S. 277, 287, 120 S. Ct. 1382, 1390, 146 L. Ed. 2d 265 (2000); De La Teja v. United States, 321 F.3d 1357, 1362 (11th Cir. 2003) ("'The doctrine of justiciability prevents courts from encroaching on the powers of the elected branches of government and guarantees that courts consider only matters presented in an actual adversarial context.'") (quoting Al Najjar v. Ashcroft, 273 F.3d 1330, 1335 (11th Cir. 2001)).

The law is clear that if, pending an appeal, events transpire that make it impossible for this court to provide meaningful relief, the matter is no longer justiciable. Al Najjar, 273 F.3d at 133. This is so even if, as here, the court has heard oral argument and has taken the case under advisement. See United States v. Koblan, 478 F.3d 1324, 1326 (11th Cir. 2007) (per curiam) (dismissing the appeal as moot despite the fact that "all briefs have been filed, oral argument has been held, and nothing remains but the issuance of this Court's opinion"). The burden of establishing mootness rests with the party seeking dismissal. See County of Los Angeles v. Davis, 440 U.S. 625, 631, 99 S. Ct. 1379, 59 L. Ed. 2d 642 (1979). This burden is a heavy one. United States v. W.T. Grant Co., 345

16

U.S. 629, 633, 73 S. Ct. 894, 897, 97 L. Ed. 1303 (1953). Moreover, dismissal is compulsory as federal subject matter jurisdiction vanishes at the instant the case is mooted. See Coral Springs, 371 F.3d at 1327.

The University claims that this appeal no longer embodies a live case or controversy because it has modified the Handbook Policy and now allows religious groups like BYX to register and has, in fact, already registered BYX's chapter as an RSO. Because it has endowed the chapter with the status and benefits of an RSO, no controversy exists and this appeal is merely academic.

BYX counters that while UF has amended the CSAI Handbook, the Regulation, the source of the constitutional violation, remains in effect. BYX claims that unless the Regulation is amended, UF may capriciously revoke BYX's RSO status at any time.[10]

BYX grounds its argument in the "voluntary cessation" doctrine, which provides that the "[m]ere voluntary cessation of allegedly illegal conduct does not moot a case." United States v. Concentrated Phosphate Export Ass'n, 393 U.S. 199, 203, 89 S. Ct. 361, 364, 21 L. Ed. 2d 344 (1968). The basis for this doctrine is a concern that a defendant who voluntarily ceases an activity is "free to return to

_____

[10] BYX also protests that the timing of UF's decision to amend the CSAI handbook demonstrates that it amended the handbook only to avoid an unfavorable appellate decision.

17

his old ways." Id. (internal quotation omitted). Yet such concern is less warranted "when the defendant is not a private citizen but a government actor." Troiano, 382 F.3d at 1283. In such cases, "there is a rebuttable presumption that the objectionable behavior will not recur." Id.; see also Coral Springs, 371 F.3d at 1328-29 ("[G]overnmental entities and officials have been given considerably more leeway than private parties in the presumption that they are unlikely to resume illegal activities."); Ragsdale v. Turnock, 841 F.2d 1358, 1365 (7th Cir. 1988) ("[C]essation of the allegedly illegal conduct by government officials has been treated with more solicitude by the courts than similar action by private parties.").

In cases where government policies have been challenged, the Supreme Court has held almost uniformly that voluntary cessation of the challenged behavior moots the claim. See, e.g., Lewis v. Cont'l Bank Corp., 494 U.S. 472, 474, 110 S. Ct. 1249, 1252, 108 L. Ed. 2d 400 (1990); Princeton Univ. v. Schmid, 455 U.S. 100, 103, 102 S. Ct. 867, 869, 70 L. Ed. 2d 855 (1982) (per curiam); Kremens v. Bartley, 431 U.S. 119, 128–29, 97 S. Ct. 1709, 1715, 52 L. Ed. 2d 184 (1977); Diffenderfer v. Cent. Baptist Church, Inc., 404 U.S. 412, 415, 92 S. Ct. 574, 576, 30 L. Ed. 2d 567 (1972). Accordingly, an assertion of mootness will be rejected "only when there is a substantial likelihood that the offending policy will

18

be reinstated if the suit is terminated." Troiano, 382 F.3d at 1284 (citing City of Mesquite v. Aladdin's Castle, 455 U.S. 283, 289 & n.11, 102 S. Ct. 1070, 1074–75 & n.11, 71 L. Ed. 2d 152 (1982), a case where the Court decided that a challenge to a city statute was not moot, because even though the city had repealed the statute, there was "no certainty" that the city would not reenact the law and the city had announced its intention to reenact the offending statute if the Court dismissed the case.).

To support its argument that the case is moot, the University has provided an affidavit of Jamie Lewis Keith, Vice President and General Counsel of UF. In her affidavit, Keith states that on January 15, 2009, "UF fully registered Beta Upsilon Chi, Upsilon Chapter ('BYX') as a Registered Student Organization on par with the hundreds of other RSOs at UF." She further avers:

> The University's decision to modify its policies relating to RSOs was a considered decision, as described in the University's attached statement, and was made with the approval of the chief executive officer of the University of Florida, President J. Bernard Machen. The University's modified policies have already taken effect and UF fully intends to apply these modified policies going forward.

(Id. at ¶ 5.)

The University has modified the Policy in the CSAI Handbook, registered BYX's chapter, and stated its intention to adhere to its modified policies. BYX

19

speculates that UF amended the Policy as a ploy to avoid an adverse ruling, and UF may reinstate its former policy and strip BYX of its RSO status if the court dismisses the appeal. BYX has failed to present any affirmative evidence to support this position, and we are not persuaded by such speculation. We hold that BYX cannot overcome the presumption that the "objectionable behavior will <u>not</u> recur." Troiano, 382 F.3d at 1283.

BYX's argument is further undermined by its own pleadings in this case. In its complaint, BYX prayed for "[a] preliminary and permanent injunction enjoining [UF] from denying to BYX [RSO] status." (Second Am. Compl. at 27.) Again, in its motion for preliminary injunction, BYX requested that the court "[p]reliminarily enjoin [UF] . . . from enforcing [its] Constitutional Guidelines and other University policies to preclude BYX from requiring that officers and members agree with the groups [sic] religious beliefs" and "[p]reliminarily enjoin [UF] . . . from denying to BYX the status, rights, and privileges of an [RSO] recognized by the University." The motion did not specify the manner in which UF would grant this relief, nor did BYX mount a facial challenge to the text of the Regulation. It merely challenged UF's refusal to register the BYX chapter as an

20

RSO. The chapter has been registered, and we will not review the manner in which UF accomplished the registration.[11]

In its final attempt to persuade us to retain jurisdiction over this appeal, BYX posits a hypothetical concerning UF's amended nondiscrimination policy. BYX notes that it requires potential members to agree with its view of the Christian faith and to conduct their lives in strict accordance with its code of conduct. The modified Policy provides that student organizations may consider the "sincerely held current religious beliefs" of prospective members and leaders, but is silent as to whether these organizations may consider their conduct (emphasis added). So, the hypothetical goes, "if a student professes to agree with BYX's religious beliefs but repeatedly gets drunk or engages in extramarital sexual conduct, it is simply unclear whether BYX is permitted to deny or expel this person from membership." (Appellant's Resp. to Appellee's Mot. to Dismiss Appeal at 20.) We will not consider the hypothetical. We lack the power to retain

---

[11] For its part, UF responds that there is no need for it to amend the Regulation. It notes that the Regulation does not address how UF's general and aspirational commitment to non-discrimination will be implemented and applied to registering student organizations. The CSAI Handbook sets forth the policy that implements the Regulation in the context of deciding whether to register a student organization. Because the CSAI Handbook policy has changed its implementation policy with regard to student organizations like BYX, BYX can become an RSO. What is critical for our purposes is not that UF has stated through the Regulation that it aspires to create and sustain a nondiscriminatory environment, but that it has decided against enforcing this policy in a way that denies the BYX chapter RSO status.

jurisdiction over a moot controversy for the purpose of rendering an advisory opinion. CMM Cable Rep., Inc. v. Ocean Coast Props., Inc., 48 F.3d 618, 622 (1st Cir. 1995).

III.

Our consideration of this case is at an end. Because the relief BYX sought has now been obtained, we lack a live controversy. The University's motion to dismiss this appeal for mootness is accordingly granted. The order of the district court denying BYX's motion for a preliminary injunction is vacated, the case is remanded, and the district court, on receipt of our mandate, shall dismiss the case as moot. See United States v. Munsingwear, Inc., 340 U.S. 36, 71 S.Ct. 104, 95 L.Ed. 36 (1950).

SO ORDERED.