[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
MARCH 11, 2011
JOHN LEY
CLERK

_____

No. 10-11474

_____

D.C. Docket No. 5:07-cv-00455-WTH-GRJ

BANKSHOT BILLIARDS, INC.,
d.b.a. Bankshot Billiards,

Plaintiff - Appellant,

versus

CITY OF OCALA,
a Florida municipal corporation,

Defendant - Appellee.

_____

No. 10-11616

_____

D.C. Docket No. 5:07-cv-00455-WTH-GRJ

BANKSHOT BILLIARDS, INC.,
d.b.a. Bankshot Billiards,

Plaintiff - Appellee,

versus

CITY OF OCALA,
a Florida municipal corporation,

                                            Defendant - Appellant.

_____

Appeals from the United States District Court
for the Middle District of Florida
_____

(March 11, 2011)

Before TJOFLAT, CARNES, and HILL, Circuit Judges.

TJOFLAT, Circuit Judge:

In this case, we consider whether a business may sue a municipality under 42 U.S.C. § 1983 to recover damages it sustained by cautiously complying with an ordinance that the business claims is unconstitutionally vague under the Fourteenth Amendment. The business does not engage in any constitutionally protected activities under the First Amendment or any other provision of the United States Constitution. It therefore does not claim that the unclear ordinance chilled protected conduct. Rather, it simply claims that the municipality violated its right to operate under clear laws. The district court denied the business's request for damages, but granted it a permanent injunction and declared the ordinance "unconstitutionally vague on its face."

2

Both the business and the municipality have appealed to this court. The business seeks § 1983 damages; the municipality asks us to vacate the injunction. Part I of this opinion sets out the facts and the procedural history of the case. Part II addresses whether the business sustained a constitutional injury and is thus owed damages under § 1983. Part III addresses the municipality's argument that the injunction is now moot because the municipality repealed the ordinance after the district court entered judgment. Part IV concludes.

I.

Bankshot Billiards, Inc. ("Bankshot") owns and operates an establishment by the same name in Ocala, Florida. Bankshot opened in 1995 as a billiard hall and operated exclusively as a billiard hall until 2004; the first floor of its two-story premises housed sixteen regulation pool tables, provided recreational billiard activities, and hosted pool tournaments. In 2004, Bankshot expanded its range of business, opening the second floor of its property as a night club. The night club offered a dance floor and music for its patrons, but was only open a few nights a week. The downstairs billiard portion was, and remains, open every day. Bankshot serves alcohol on its premises pursuant to a liquor license from the State of Florida, and also serves limited food items and non-alcoholic beverages. Until the present dispute arose, it permitted entry to persons under the age of twenty-one

3

in both the upstairs night club and the downstairs billiard hall.

Starting in 2005, the City of Ocala (the "City") began to express its concern that people under twenty-one were frequenting establishments serving alcohol. To that end, the City passed a series of zoning ordinances. In January 2005, the City passed an ordinance creating an age-restriction provision making it unlawful for anyone under twenty-one to enter an establishment selling alcohol. Bankshot and another establishment complained about this measure, filing suit in Florida state court. The City relaxed its rules and, in March 2005, amended the age-restriction ordinance to create an exemption to the under twenty-one prohibition for several categories of businesses, including billiard halls. The exemption would apply when, for billiard halls, the operation of billiards was the "primary attraction held out to the public." Even with the upstairs night club, the record suggests that the City believed that Bankshot qualified for this exemption; Bankshot continued to permit persons under twenty-one to enter its premises without incident.[1]

In July 2006, however, Bankshot took control of the adjacent store front and sought to expand its night club operations into that area. Bankshot applied for a building permit for the location and requested an opinion regarding what effect the

---

[1] It is unclear what became of this 2005 lawsuit, i.e., whether it was dismissed voluntarily or terminated via a judgment. Regardless, that action is only relevant for background purposes.

4

expansion would have on its billiard hall exemption. An assistant city attorney sent a letter in response to this request. The letter first noted that the City and the Ocala police determine violations on a case-by-case basis and do not normally give advance opinions regarding violations. The city attorney opined, however, that, "given the size and configuration of the new area, [Bankshot] will likely, at least during certain times, have many more people dancing than playing, watching or waiting to play pool" and therefore would likely not be eligible for the pool hall exemption. If that were the case, Bankshot would have to exclude persons under twenty-one from its premises—the night club and the billiard hall—at all times.

Bankshot sought further clarification from several sources, meeting with Ocala police and the City Council. While Bankshot pursued these clarifications, the City passed two ordinances that amended the age-restriction provision to narrow and further define the billiard hall exemption.[2] One of those amendments, which was passed in January 2007, excluded establishments from claiming the billiard hall exemption if they engaged in certain alcohol sales activities, such as minimum drink purchases, ladies nights, and serving drinks without charge.

Bankshot engaged in some of these activities during portions of its

---

[2] These clarifications applied to a wider range of businesses, but only those portions pertaining to billiard halls are relevant here.

5

operating hours. Believing that this categorically barred it from claiming the billiard hall exemption, Bankshot stopped admitting persons under twenty-one during all hours. After it stopped admitting patrons under twenty-one, Bankshot's gross revenues dropped from an average of $62,023.75 per month to an average of $33,566.64 per month.

In March 2007, Bankshot sued the City in the Circuit Court of Marion County, Florida.[3] Bankshot's pleading requested injunctive and declaratory relief from the January 2007 amendments.

In response, the City repealed these amendments and, in April 2007, passed Ordinance 5650 (the "Ordinance"). The Ordinance re-wrote the City's age-restriction scheme using a complex web of definitions and exemptions. Because the Ordinance is the ordinance at issue in these appeals, it is useful here to lay out the Ordinance's relevant components.

The Ordinance's core provision bars persons under twenty-one "to enter or remain in any alcohol beverage establishment . . . except as hereinafter provided." Ordinance § 6-9(b). An "alcohol beverage establishment" is a "bottle club, cocktail bar or nightclub." Id. § 6-9(a)(1). A "nightclub" is defined as an

---

[3] Two other plaintiffs were named in Bankshot's original complaint. They were deleted from the Supplemental Complaint and are no longer parties in this case.

establishment that: is open after 11:00 p.m.; has floor space available and used for dancing; and has a band, orchestra or other form of music or musical or other entertainment. If the establishment meets the foregoing requirement during any business day, it is a "nightclub" for purpose of this section on all business days.

Id. § 6-9(a)(10). Bankshot was a "nightclub" under this definition and would, without an exemption, be prohibited from admitting persons under twenty-one.

Billiard halls were, as in the prior ordinances, exempted from the age-restriction provision under the Ordinance. Id. § 6-9(c)(7). The Ordinance in turn defined "billiard hall" as:

a) Having the greater of: (i) 12 pool or billiard tables, or (ii) one full-size pool or billiard table per 625 square feet of gross floor area of the business establishment. Each pool or billiard table must have a playing surface at least three and one-half feet by seven feet, and there must be an unobstructed path of at least four and one-half feet between all sides of the pool or billiard table and any other object, wall or other pool or billiard table;

b) Where the operation of pool or billiard tables is the primary attraction held out to the public and the primary amusement engaged in by patrons. For purposes of this subsection, all of the following criteria must be met for the operation of pool or billiard tables to be the primary amusement engaged in by patrons:

1) The playing or watching of pool or billiards must be the most significant activity engaged in by patrons.

2) The patrons must be able to play pool or billiards during all hours the premises are open to the public, and pool cues and balls must be available for use during all such time periods.

3) More than half of the patrons on the premises must be playing pool or billiards, waiting to play pool or billiards, or watching the playing of pool or billiards.

4) The establishment may not charge a fee to enter (e.g., a "cover charge") for portions of the establishment not containing pool or billiard tables.

5) Any portion of the establishment available and used for dancing may not exceed the lesser of: (i) 400 square feet; or (ii) 20 percent of the square footage of the portion of the establishment open to the public that is not devoted to playing pool or billiards;

c) Where at least 50 percent of the square footage of the portion of the establishment open to the public is devoted to playing pool or billiards.

Id. § 6-9(a)(2).

The Ordinance does not end there. Under one "Limitation" to the Ordinance, even if a business met the definition of a billiard hall, the establishment could lose its billiard hall exemption under another portion of the Ordinance and thus be forced to exclude persons under twenty-one. This Limitation reads:

Subject to [the next subsection], in order to qualify for [the billiard hall exemption], a . . . billiard hall . . . must meet the definition therefor . . . during the entire time that the establishment is open for business; provided, however, the failure of an establishment to meet such criteria during isolated time periods for reasons other than the conduct of the establishment shall not cause the establishment to fail to qualify for the exemption.

8

Id. § 6-9(d)(1) (emphasis added).[4]  Notwithstanding the Limitation's implication

that part-time exemptions are impermissible, the Ordinance's next subsection

provides for a part-time exemption:

> (1) An establishment may engage in different types of activities, and thus constitute different types of uses, during particular business days for purposes of determining whether it is exempt under [the billiard hall exemption].  That is, an establishment may be exempt during particular business days and not exempt on others.  For example, and without limitation, an establishment may constitute both a nightclub and a bona fide [billiard hall] on certain business days (on which business days persons under the age of twenty-one may be admitted) and thereafter constitute a nightclub only (on which business days persons under the age of twenty-one may not be admitted).
>
> . . . .
>
> (3) In order to be able to claim that an establishment is exempt on a part-time basis, all of the following requirements must be met by the establishment; if the establishment fails to meet such requirements, any exemption shall not be recognized by the city and the provisions of [the underage prohibition] shall apply:
>
>> a. The establishment shall first provide written notice to the building official and the police chief that its activities are exempt on certain days and not exempt on others.  Such notice shall contain the types of exemption claimed by the establishment (using the same terms therefor as set forth in [the definition of a billiard hall]) and the days during which the establishment shall be exempt.  If the establishment thereafter changes its type of exemption or the days it is exempt, it shall provide, before such change, an additional notice thereof to the building

---

[4]  This portion of the Ordinance also includes requirements not germane to these appeals.

official and the police chief.

> b. All portions of an establishment that claim to be exempt must qualify for the same exemption on the same business day.  For example, an establishment may not claim to be a bona fide [billiard hall] in a portion of its premises, but not in other portions of its premises, on the same day.

Id. § 6-9(e)(1), (3).

The Ordinance provides for criminal and civil penalties, as well as the possible revocation of a location permit by the City Council.  The Ocala police are tasked with enforcing the Ordinance only in response to complaints; the police do not proactively enforce the Ordinance.

After the City passed the Ordinance, Bankshot amended its complaint to reflect the Ordinance's provisions.[5]  And, with the court's permission, Bankshot filed a second amended complaint (the "Supplemental Complaint") on September 7, 2007.

The Supplemental Complaint laid out the Ordinance's components and alleged that the Ordinance violated Bankshot's rights under the Due Process Clause of the Fourteenth Amendment to the United States Constitution because the Ordinance was "vague and ambiguous on its face and as enforced."

---

[5]  Bankshot filed its first amended complaint on May 27, 2007.

Supplemental Compl. ¶ 26.[6]

Bankshot fashioned its suit as a facial challenge to the Ordinance. The Supplemental Complaint did not allege facts about Bankshot's business and then describe how Bankshot was unable to understand the Ordinance as applied to its business model.[7] Bankshot instead demonstrated the Ordinance's deficiencies by describing hypothetical situations that would result in illogical and unintended consequences if the Ordinance was applied as written. For example, two paragraphs of the Supplemental Complaint read:

> D. [The Ordinance], as written, enacted and enforced, violated equal protection because it makes it illegal for persons under twenty-one years of age to go through a hotel lobby which contains a lobby bar, or hotel hallway which contains a bar and places restrictions on alcoholic beverage establishments that are not reasonably calculated to serve the purposes desired and which unlawfully discriminate against business establishments from other businesses.
>
> E. [The Ordinance], in its plain language, if a business establishment when it first opens has the first few people that come in order only alcoholic beverages, then the establishment would be a cocktail

---

[6] Bankshot further alleged: (1) the Ordinance's terms and enforcement were "arbitrary and capricious"; (2) the Ordinance was overbroad; (3) the Ordinance was a bill of attainder; (4) the Ordinance violated equal protection; (5) the Ordinance violated procedural and substantive due process; and (6) the Ordinance violated two provisions of Florida law regarding local regulation of alcohol-serving establishments, Fla. Stat. §§ 561.02, 562.45(c). Supplemental Compl. ¶ 26.

[7] The Supplemental Complaint described Bankshot's business in one short paragraph: "BANKSHOT owns and operates BANKSHOT BILLIARDS, which is a billiard hall as that phrase is commonly and generally known and operates as a business in the City of Ocala. It holds an Alcoholic Beverage License with the State of Florida." Supplemental Compl. ¶ 5.

11

lounge for the entire time that it is open.

Id. ¶ 26(D)–(E). In this sense, Bankshot's claim that the Ordinance was "vague and ambiguous . . . as enforced" applied only to these hypothetical businesses, not to Bankshot.

To remedy these purported constitutional harms, Bankshot requested a declaratory judgment, temporary and permanent injunctions, and money damages under 42 U.S.C. § 1983. The § 1983 damages claim was a new claim in the Supplemental Complaint. Bankshot alleged that the City was liable under the civil rights statute for violating Bankshot's rights under the Due Process Clause of the Fourteenth Amendment.[8] To support its damages claim, Bankshot relied on the ambiguity inherent in the Ordinance and the following additional facts:

A. Law enforcement officers and other city employees have made inconsistent, confusing, and conflicting statements as to the applicability of [the Ordinance] and how it would be enforced; the purpose being to drive BANKSHOT out of business.

B. Law enforcement officers and other employees of the CITY are selectively enforcing [the Ordinance] in an effort to drive BANKSHOT out of business.

C. The actions of the CITY and its employees and agents, are in willful and wanton disregard of the rights of BANKSHOT, both in the State and Federal Constitutions and Florida Statutes and are done

---

[8] Bankshot also alleged, without elaboration, that the ordinance violated its rights under the Fifth, Eighth, and Ninth Amendments to the Constitution.

12

with malice.

Id. ¶ 40(A)–(C).

Noting the addition of the § 1983 claim, the City removed the case on November 9, 2007, to the United States District Court for the Middle District of Florida pursuant to 28 U.S.C. § 1441.

After nearly a year of discovery, the City moved for summary judgment on September 11, 2008. See Fed. R. Civ. P. 56. It first argued that Bankshot did not have standing to bring a pre-enforcement challenge to the Ordinance because it had not shown a "realistic danger of sustaining direct injury as a result of the statute's operation or enforcement." It also argued that Bankshot could not challenge portions of the Ordinance that did not apply to Bankshot. This argument was in response to portions of the Supplemental Complaint that referenced ambiguities in the treatment of "bona fide restaurants" and "public lodging establishments," neither of which applied to Bankshot.

On the merits of Bankshot's constitutional challenge, the City offered relatively terse arguments that the Ordinance was not vague or overly broad. It further argued that the overbreadth doctrine was inapplicable to Bankshot because

Bankshot did not allege that it was engaged in First Amendment activities.[9]

Regarding the § 1983 claim, the City first argued that Bankshot had not been deprived of a constitutional right; the City had taken no action against it. Alternatively, if the court found a constitutional violation, the City argued that Bankshot had not shown that the City had any practice or policy that caused the violation. Because demonstrating a practice or policy is a necessary element to hold liable a municipality under § 1983, the city argued that no liability could possibly exist.[10]

The district court ruled on the City's motion on February 12, 2010. It first found that Bankshot had standing to challenge as unduly vague the portions of the Ordinance that applied to it. The fact that it had not been prosecuted was unimportant. The court stated that "there is no assurance that the Ordinance will not be enforced against Bankshot, and the record shows that others have been prosecuted under its predecessor versions."[11] Under the district court's view,

---

[9]  The City further contested Bankshot's assertion that the Ordinance denied equal protection, was a bill of attainder, and violated state law. The City also argued that, in the event that portions of the Ordinance were unconstitutional, they were severable from the unchallenged provisions.

[10]  See Monell v. Dep't of Soc. Servs., 436 U.S. 658, 691, 98 S. Ct. 2018, 2036, 56 L. Ed. 2d 611 (1978). The City also argued that it could not be held liable under a respondeat superior theory for the actions of its police or other city employees.

[11]  By 2008, two people had been prosecuted.

Bankshot's challenge fell well within the settled law allowing pre-enforcement review of statutes where the plaintiff claims the statute deters the exercise of constitutional rights.[12]

Bankshot's § 1983 damages claim was also dismissed. The court found that Bankshot lacked standing to bring a damages claim because "it ha[d] not yet suffered any harm by virtue of the enforcement of the Ordinance." While this issue was no bar to a pre-enforcement challenge, the district court found that Bankshot's lost revenue was "solely due to its own election to exclude all persons under age twenty-one at all times. There has been no act, policy, or custom which directly caused Bankshot's losses."

Turning to the merits of Bankshot's vagueness claim, the district court found the Ordinance unconstitutionally vague.[13] The court so held for two reasons. First, the terms of the Ordinance were "vague and uncertain, rendering it impossible for billiard halls such as Bankshot to determine whether and when they are violating the Ordiance." The court pointed to the vague definition of "billiard hall" and to internal inconsistencies within the Ordinance. These inconsistencies

_____

[12] Bankshot did not have standing as to its other claims, however. The district court granted the City's motion with regard to Bankshot's equal protection claim, its bill of attainder claim, and its assertion that the Ordinance was vague as applied to other establishments.

[13] The district court treated Bankshot's response as a cross-motion for summary judgment.

included: (1) the overlapping definitions of "billiard hall" and "nightclub"; and (2) the Ordinance's provisions of part-time exemptions, notwithstanding the prior subsection's implication that part-time exemptions do not exist.

The Ordinance's second failing was that its lack of clarity "raise[d] the likelihood of its arbitrary or discriminatory enforcement." Conflicting provisions and requirements that certain conditions must be met "at all times" would effectively give Ocala police officers unbridled enforcement discretion.

The court's discussion demonstrated that Bankshot was mounting—and the court was deciding—a facial challenge. Its analysis discussed only the Ordinance's terms and hypothetical fact scenarios; it never applied the statute to the specific facts of Bankshot's business except to say that, as a billiard hall, Bankshot could not know whether the Ordinance applied to it.[14]

After finding that the Ordinance provisions Bankshot challenged were not severable from the remaining provisions, the district court declared the whole Ordinance unconstitutionally vague as a matter of law. The court entered judgment declaring the statute "unconstitutionally vague on its face" in violation of the Fourteenth Amendment and permanently enjoined the City from enforcing

---

[14] The court's protestation that it was not deciding "the constitutionality of the Ordinance as applied to any party or form of business other than Bankshot" does not square with its judgment that the ordinance was "unconstitutional on its face."

the Ordinance against Bankshot.[15]

Both parties appealed. Bankshot challenges the denial of § 1983 damages, arguing that the City's unconstitutionally vague ordinance was a municipal policy sufficient to sustain liability. The City's separate appeal raises three issues challenging the declaratory judgment and injunction. First, it notes that the City repealed the Ordinance in June 2010 and no longer places restrictions on admitting persons under twenty-one; it therefore argues that the injunction should be vacated as moot. Second, the City argues that the Ordinance was not unconstitutionally vague on its face. Third, the City argues that the allegedly unconstitutional provisions are severable from the portions challenged by Bankshot.

## II.

The district court rejected Bankshot's damages claim. In its February 12 Order, the court ruled that Bankshot did not have standing to bring a claim for damages under § 1983 because the City had never prosecuted it under the allegedly vague ordinance. Any "damages" were therefore of its own doing; Bankshot lost money because it voluntarily complied with the Ordinance, not because of any "act, policy, or custom" attributable to the City.

---

[15] On February 25, 2010, Bankshot moved to alter or amend the judgment dismissing its § 1983 damages claim under Fed. R. Civ. P. 59(e). The court denied the motion on March 4, 2010.

On appeal, Bankshot argues that the Ordinance's incomprehensible wording violated its constitutional rights and caused it to lose revenue. Bankshot claims that, as a result of this poor draftsmanship, it cautiously complied with the Ordinance and excluded persons under twenty-one, costing it half its revenues.[16] According to Bankshot, the Ordinance is the municipal "act, policy, or custom" establishing liability under § 1983.[17]

The City is a municipal entity. To recover damages under § 1983, Bankshot must show: "(1) that [its] constitutional rights were violated; (2) that the municipality had a custom or policy that constituted deliberate indifference to that constitutional right; and (3) that the policy or custom caused the violation." McDowell v. Brown, 392 F.3d 1283, 1289 (11th Cir. 2004) (citing City of Canton v. Harris, 489 U.S. 378, 388, 109 S. Ct. 1197, 1204–05, 103 L. Ed. 2d 412 (1989)). The district court apparently found Bankshot's evidence lacking on a combination of the second and third prongs. After reviewing the district court's determinations of law de novo and its factual findings for clear error, Scott v.

---

[16] The City's mootness argument, addressed in part III, infra, does not affect our jurisdiction to hear Bankshot's damages claim.

[17] The City's answer brief offers a baffling interpretation of Bankshot's Notice of Appeal. It argues that Bankshot only appealed the district court's denial of its Rule 59(e) motion, which is subject only to abuse of discretion review. We do not read the Notice of Appeal so narrowly; it clearly states that Bankshot based its appeal on the district court's February 12 judgment.

18

Roberts, 612 F.3d 1279, 1289 (11th Cir. 2010), we affirm the district court's denial of damages. We do so, however, on different grounds; Bankshot has not demonstrated that its constitutional rights have been violated.

The Fourteenth Amendment prohibits States and their components from "depriv[ing] any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. Due process encompasses the concepts of notice and fair warning. At its core, "the . . . principle is that no man shall be held criminally responsible for conduct which he could not reasonably understand to be proscribed." United States v. Lanier, 520 U.S. 259, 265, 117 S. Ct. 1219, 1225, 137 L. Ed. 2d 432 (1997) (quoting Bouie v. City of Columbia, 378 U.S. 347, 351, 84 S. Ct. 1697, 1701, 12 L. Ed. 2d 894 (1964)).

Vagueness is a "related manifestation[] of the fair warning requirement." Id. at 266, 117 S. Ct. at 1225. "[T]he touchstone is whether the statute, either standing alone or as construed, made it reasonably clear at the relevant time that the defendant's conduct was criminal." Id. at 267, 117 S. Ct. at 1225.

We do not apply these principles in a vacuum, however. Litigants may not comb the statute books for poorly drafted laws and sue to enjoin their enforcement. As Younger v. Harris, 401 U.S. 37, 91 S. Ct. 746, 27 L. Ed. 2d 669 (1971), instructs us:

19

> The power and duty of the judiciary to declare laws unconstitutional is in the final analysis derived from its responsibility for resolving concrete disputes brought before the courts for decision; a statute apparently governing a dispute cannot be applied by judges, consistently with their obligations under the Supremacy Clause, when such an application of the statute would conflict with the Constitution. But this vital responsibility, broad as it is, <u>does not amount to an unlimited power to survey the statute books and pass judgment on laws before the courts are called upon to enforce them</u>.

<u>Id.</u> at 52, 91 S. Ct. at 754 (emphasis added) (internal citation omitted).

Instead, we review statutes for vagueness concerns only when a litigant alleges a constitutional harm. These harms—or, injury, if you like—come in two forms. In the first form, a person violates the vague law, is indicted, and then moves the trial court to dismiss the indictment—or reverse a conviction—against him, arguing that he did not receive notice that his conduct was proscribed. <u>See, e.g.</u>, <u>Skilling v. United States</u>, ___ U.S. ____, 130 S. Ct. 2896, 2925–35, 177 L. Ed. 2d 619 (2010) (addressing the defendant's argument that the Court must vacate his conviction for honest-services wire fraud because the statute was unconstitutionally vague); <u>City of Chicago v. Morales</u>, 527 U.S. 41, 119 S. Ct. 1849, 144 L. Ed. 2d 67 (1999) (addressing vagueness concerns following a conviction under Chicago's "Gang Congregation Ordinance"). The injury remedied by this process is the deprivation of liberty—incarceration—without due process because the criminal defendant was not on notice that his conduct was

20

criminal.

The second form is implicated when a litigant asks the federal court to review a vague statute before the State seeks to enforce its law, known as pre-enforcement review. This review deviates from the first form because the State has not yet enforced the vague law; we do not know if the litigant will ever be deprived of his liberty without due process of law. But we review these claims when the vague law causes a separate injury: the litigant is chilled from engaging in constitutionally protected activity. See Babbitt v. United Farm Workers Nat'l Union, 442 U.S. 289, 301–03, 305–06, 99 S. Ct. 2301, 2310–11, 2312, 60 L. Ed. 2d 895 (1979) (permitting review of a state statute limiting a union's publicity rights and providing criminal penalties for violations, but abstaining from review to await a potentially narrowing state court construction); Steffel v. Thompson, 415 U.S. 452, 459, 94 S. Ct. 1209, 1216, 39 L. Ed 2d 505 (1974) (reviewing a challenge to a trespass statute as applied to a handbill distributor because "it is not necessary that petitioner first expose himself to actual arrest or prosecution to be entitled to challenge a statute that he claims deters the exercise of his constitutional rights" to free speech); Baggett v. Bullit, 377 U.S. 360, 372, 84 S. Ct. 1316, 1323, 12 L. Ed. 2d 377 (1964) (providing pre-enforcement review of a state law requiring teachers to pledge oaths of allegiance to the United States,

thereby implicating the First Amendment); see also Kolender v. Lawson, 461 U.S. 352, 358, 103 S. Ct. 1855, 1858–59, 75 L. Ed. 2d 903 (1983) (providing pre-enforcement review of a loitering statute that "implicates consideration of the constitutional right to freedom of movement").

Under this second paradigm, pre-enforcement review provides law-abiding citizens with a middle road between facing prosecution and refraining from otherwise constitutional conduct. Without pre-enforcement review, those citizens would be forced to choose between "the Scylla of intentionally flouting state law and the Charybdis of forgoing what [they] believe[] to be constitutionally protected activity in order to avoid becoming enmeshed in a criminal proceeding." Steffel, 415 U.S. at 462, 94 S. Ct. at 1217 (citing Dombrowski v. Pfister, 380 U.S. 479, 490, 85 S. Ct. 1116, 1123, 14 L. Ed. 2d 22 (1965)). It is thus the plaintiff's desire to engage in constitutionally protected conduct that excepts him from the choice of either violating or complying with the vague law.

Neither paradigm applies to Bankshot's claims. Bankshot has not been prosecuted; it has not lost its license; it has not been fined. The first form is therefore inapplicable.

Bankshot similarly cannot avail itself of the pre-enforcement review paradigm. It operates a pool hall and wants to admit patrons under twenty-one

while also serving alcohol. The pre-enforcement review paradigm hardly fits our record; even though Bankshot is "chilled" from engaging in an activity in which it once engaged, that activity is not constitutionally protected. Rather, it is normal business activity; Bankshot is simply unsure whether it may simultaneously serve alcohol and permit entry to persons under twenty-one. Cf. Kolender, 461 U.S. at 358 n.8, 103 S. Ct. at 1859 n.8 (emphasizing that courts are more tolerant of a vague statute that "'simply regulates business behavior'" (quoting Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc., 455 U.S. 489, 499, 102 S. Ct. 1186, 1194, 71 L. Ed. 2d 362 (1982))).

With neither paradigm applicable, we find that Bankshot has not suffered a constitutional injury at the City's hands. Its lost business was, therefore, the result of its own decision to obey the statute rather than risk prosecution. We accordingly affirm the district court's denial of damages under § 1983.

## III.

The district court permanently enjoined the Ordinance and declared its provisions "unconstitutionally vague on its face" in violation of the Fourteenth Amendment. After the court rendered this judgment, the City repealed the Ordinance. On appeal, the City argues that this repeal renders the district court's judgment moot and submits that, without a proper Article III case or controversy,

23

we must vacate the injunction.

Under Article III of the Constitution, federal courts may only hear live "cases" and "controversies." U.S. Const. Art. III, § 2. "If events that occur subsequent to the filing of a lawsuit . . . deprive the court of the ability to give the plaintiff . . . meaningful relief, then the case is moot and must be dismissed." Sheely v. MRI Radiology Network, 505 F.3d 1173, 1183 (11th Cir. 2007) (citing Troiano v. Supervisor of Elections, 382 F.3d 1276, 1281–82 (11th Cir. 2004)). Here, the City argues that, because it repealed the Ordinance, the district court's injunction currently enjoins nothing and the case is moot.

Bankshot disagrees. It argues that the repeal does not affect our jurisdiction because the City acted solely to deprive this court of jurisdiction and will likely re-impose the purportedly unconstitutional measure.

"The doctrine of voluntary cessation provides an important exception to the general rule" of mootness. Troiano, 382 F.3d at 1282. "It is well settled that 'a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice.'" Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc., 528 U.S. 167, 189, 120 S. Ct. 693, 708, 145 L. Ed. 2d 610 (2000) (quoting City of Mesquite v. Aladdin's Castle, Inc., 455 U.S. 283, 289, 102 S. Ct. 1070, 1074, 71 L. Ed. 2d 152 (1982)). "Otherwise, a

24

party could moot a challenge to a practice simply by changing the practice during the course of the lawsuit, and then reinstate the practice as soon as the litigation was brought to a close." Jews for Jesus, Inc. v. Hillsborough Cnty. Aviation Auth., 162 F.3d 627, 629 (11th Cir. 1998). Accordingly, the voluntary cessation of challenged conduct will only moot a claim when there is no "reasonable expectation" that the accused litigant will resume the conduct after the lawsuit is dismissed. Id.; see also Laidlaw, 528 U.S. at 189, 120 S. Ct. at 708.

Generally, the "party asserting mootness" bears the "heavy burden of persuading the court that the challenged conduct cannot reasonably be expected to start up again." Laidlaw, 528 U.S. at 189, 120 S. Ct. at 708 (internal citations and alteration omitted). We also recognize, however, that "government actor[s enjoy] a rebuttable presumption that the objectionable behavior will not recur." Troiano, 382 F.3d at 1283 (emphasis in original); see also Harrell v. The Fla. Bar, 608 F.3d 1241, 1266 (11th Cir. 2010) ("[W]e have applied a 'rebuttable presumption' in favor of governmental actors . . . ."); Sheely, 505 F.3d at 1183 ("[G]overnment actors receive the benefit of a rebuttable presumption that the offending behavior will not recur."). Hence, "the Supreme Court has held almost uniformly that voluntary cessation [by a government defendant] moots the claim." Beta Upsilon Chi Upsilon Chapter v. Machen, 586 F.3d 908, 917 (11th Cir. 2009) (collecting

25

cases). And "this Court has consistently held that a challenge to government policy that has been unambiguously terminated will be moot in the absence of some reasonable basis to believe that the policy will reinstated if the suit is terminated." Troiano, 382 F.3d at 1285.

These legal standards are fact-intensive inquiries. Because this issue was raised for the first time on appeal, we have no factual record before us. We therefore remand the injunction and declaratory judgment issues to the district court to evaluate the parties' mootness arguments.[18]

IV.

We **AFFIRM** the district court's judgment regarding Bankshot's request for damages under § 1983, and we **REMAND** the issue of the injunction and declaratory relief to the district court.

**SO ORDERED.**

---

[18] Should the district court find that the issue is not moot, we trust that it will consider the logic of our discussion regarding Bankshot's damages claims in part II, supra, and the Supreme Court's direction that, where a statute does not reach constitutionally-protected conduct, a statute is facially void for vagueness only if it is impermissibly vague in all its applications, Hoffman Estates, 455 U.S. at 497, 102 S. Ct. at 1193.