**UNITED STATES of America**

v.

**Toros SEHER, Chaplin's Inc., and Chaplin's Midtown, Inc., Defendants.**

**Criminal Action File No. 1:06–cr–322–TCB.**

United States District Court, N.D. Georgia, Atlanta Division.

Feb. 17, 2010.

J. Gabriel Banks, United States Attorney's Office, Atlanta, GA, for United States of America.

Toros Seher, pro se.

Chaplin's Inc., pro se.

Chaplin's Midtown, Inc., pro se.

*ORDER*

TIMOTHY C. BATTEN, SR., District Judge.

## I. *Background*

On March 26, 2009, 562 F.3d 1344, the Eleventh Circuit remanded this action for further proceedings on three issues: (1) whether forfeiture of the inventory and funds seized from Chaplin's Midtown, Inc. ("Midtown") and Chaplin's, Inc. ("Chaplin's") violates the Eighth Amendment; (2) whether the funds seized from Chaplin's bank account are directly forfeitable property involved in that Defendant's crimes; and (3) whether all Defendants should be jointly and severally liable for the $54,800 personal money judgment that this Court imposed in connection with counts two through seven of the indictment. *See United States v. Seher*, 562 F.3d 1344, 1370–74 (11th Cir.2009).

On December 15, 2009, the Court heard oral argument regarding these issues, and the parties have filed briefs clarifying their positions. Notably, the Government states that it no longer argues that the $75,068.89 that it seized from Chaplin's bank account represents directly forfeitable proceeds, thereby rendering that issue (issue 2 above) moot. The Court will now consider the remaining issues.

## II. *Discussion*

### A. *Piercing the Corporate Veil/Alter Ego*

█ The Court will first address whether all Defendants may be held jointly and severally liable for the $54,800 personal money judgment that the Court imposed in connection with counts two through seven of the indictment. As the Eleventh Circuit noted, joint and several liability as to the corporate defendants for a personal money judgment of $54,800 "would [only] be acceptable if [the district court] pierced

the corporate veil and deemed Chaplin's and Midtown the functional equivalent of a single corporation." *Seher,* 562 F.3d at 1372.

 "[T]he cardinal rule of corporate law is that a corporation possesses a legal existence separate and apart from that of its officers and shareholders." *Amason v. Whitehead,* 186 Ga.App. 320, 321–22, 367 S.E.2d 107, 108 (1988). Upon equitable principles, the legal entity of a corporation may be disregarded; however, "great caution should be exercised by the court in doing so." *Id.; see also Dole Food Co. v. Patrickson,* 538 U.S. 468, 475, 123 S.Ct. 1655, 155 L.Ed.2d 643 (2003).

The Government argues that the corporate Defendants, Chaplin's and Midtown, were inextricably intertwined with Seher, acting as his alter ego and alter egos of each other. During the hearing on December 15, 2009, the Government attempted to proffer evidence to support this theory. However, as the Court indicated at the hearing, the Government failed to carry its burden on this issue.

The corporate Defendants, through the testimony of their outside accountant, Joseph Eugene Poythress, demonstrated that Chaplin's and Midtown operated as separate and distinct entities. Each corporation maintained separate books and records, intra-company loans were properly recorded on the books, and the two corporations filed separate tax returns. For these reasons, the Court finds that

piercing the corporate veil would be inappropriate, and that joint and several liability does not apply in connection with the money judgment. Thus, with respect to the corporate Defendants, a personal money judgment should be entered against Chaplin's for $22,000 and against Midtown for $32,800.[1]

## B. *Eighth Amendment* [2]

 The Excessive Fines Clause of the Eighth Amendment bars forfeitures that are grossly disproportionate or excessive in relation to the offense committed. *United States v. Bajakajian,* 524 U.S. 321, 323, 118 S.Ct. 2028, 141 L.Ed.2d 314 (1998) (prohibiting forfeitures that are "grossly disproportional to the gravity of a defendant's offense"); *Alexander v. United States,* 509 U.S. 544, 558–59, 113 S.Ct. 2766, 125 L.Ed.2d 441 (1993). "The touchstone of the constitutional inquiry under the Excessive Fines Clause is the principle of proportionality: The amount of the forfeiture must bear some relationship to the gravity of the offense that it is designed to punish." *Bajakajian,* 524 U.S. at 334, 118 S.Ct. 2028. The burden of showing disproportionality falls squarely on the defendant. *United States v. Jose,* 499 F.3d 105, 108 (1st Cir.2007); *United States v. Ahmad,* 213 F.3d 805, 808 n. 1, 816 (4th Cir.2000).

The Eleventh Circuit has explained that there are three factors that guide the proportionality inquiry: "(1) whether the de-

---

1. The corporate Defendants concede that they are liable for these amounts.

2. The Court assumes that the corporate Defendants are entitled to raise an Eighth Amendment challenge. Whether the protections of the Eighth Amendment extend to a corporation is an open question that remains unaddressed by this Circuit or the Supreme Court. *See United States v. Pilgrim Market Corp.,* 944 F.2d 14, 22 (1st Cir.1991) ("We

will assume for purposes of our discussion that the eighth amendment proscription against excessive fines applies to corporations, although this is a very tenuous assumption."); *but see Browning–Ferris Indus. v. Kelco Disposal, Inc.,* 492 U.S. 257, 296–98, 109 S.Ct. 2909, 106 L.Ed.2d 219 (1989) (opinion of Justice O'Connor, concurring in part and dissenting in part, arguing that the excessive fine protections do apply to corporations).

fendant falls into the class of persons at whom the criminal statute was principally directed; (2) other penalties authorized by the legislature (or the Sentencing Commission); and (3) the harm caused by the defendant." *United States v. Browne,* 505 F.3d 1229, 1281 (11th Cir.2007).

### 1. *Class of Persons*

■ As noted above, the first *Browne* factor asks whether Chaplin's and Midtown fall into the class of persons at whom 31 U.S.C. § 5324 and 18 U.S.C. § 1956 (the statutes that they were found to have violated) were principally directed. The corporate Defendants argue that the principal type of defendant at whom Congress directed 31 U.S.C. § 5324 is an individual who causes the non-financial trade or business to fail to file a Form 8300, not the corporate entities themselves.[3]

In an attempt to support this argument, the corporate Defendants point to the language of the statute, which provides in pertinent part that "No person shall, for the purpose of evading the reporting requirements of section 5331 ... cause or attempt to cause a nonfinancial trade or business to fail to file a report required under section 5331...." 31 U.S.C. § 5324(b)(1). Tracking this language, the corporate Defendants contend that it is not feasible for them to cause themselves to fail to file Form 8300s. Defendants also rely upon remarks that were made by Congressman St. Germain during the legislative debate over § 5324, in which he speaks of "individuals" and "persons" in describing potential violators of the statute. *See* 132 Cong. Rec. H6519–01, 1986 WL 789841 (1986).

Although the corporate Defendants' argument is a creative one, the Court is not persuaded by it. The gravamen of the corporate Defendants' argument is that they were charged with the wrong currency reporting offense. This argument ignores the fact that the corporate Defendants pleaded guilty to violations of 31 U.S.C. § 5324 and never moved to dismiss the indictment on the basis that they were improperly charged. Moreover, Defendants' argument also glosses over the fact that the Eleventh Circuit affirmed their convictions, and in doing so never questioned the propriety of the Government's prosecuting them pursuant to 31 U.S.C. § 5324.

Furthermore, the corporate Defendants' argument is misplaced because it asks the Court to read 31 U.S.C. § 5324 in isolation. The corporate Defendants fail to take in account that in addition to 31 U.S.C. § 5324, they were convicted of violating 18 U.S.C. § 1956, a statute as to which no question exists that Congress intended for corporations to stand at the dead-center of the targeted class.

As the Government details in its post-hearing brief, Congress enacted 18 U.S.C. § 1956 and 31 U.S.C. § 5324 as part of the Money Laundering Control Act of 1986, a set of statutes that composed the larger Comprehensive Crime Control Act of 1986. Congress constructed the Comprehensive Crime Control Act to fashion a "forceful counteroffensive" designed to combat this nation's drug problem by enlisting "every segment of ... society" in an "all fronts" war against the drug trade. *See* 132 Cong. Rec. H6519–01, 1986 WL 789841. Thus, the corporate Defendants' reading of 31 U.S.C. § 5324 provides an incomplete picture of the sweeping legislative scheme enacted by Congress to broadly target money laundering offenses.

**3.** The corporate Defendants contend that 31 U.S.C. § 5331 is the statute under which organizations may be held accountable for re-

porting violations. Significantly, unlike 31 U.S.C. § 5324, a violation of 31 U.S.C. § 5331 does not trigger criminal forfeiture.

For all of these reasons, the Court rejects the corporate Defendants' argument that they do not fall within the class of persons at whom 31 U.S.C. § 5324 and 18 U.S.C. § 1956 were principally directed.

### 2. *Seriousness of the Offenses*

■ The second *Browne* factor requires the Court to assess the seriousness of the offenses committed by the corporate Defendants. An examination of the available statutory penalties in conjunction with the penalties called for under the United States Sentencing Guidelines shows that the corporate Defendants' offenses are gravely serious.[4]

The available incarceration terms weigh heavily in favor of finding that the offenses are extremely serious. An individual convicted of the same violations as Chaplin's faces a twenty-year maximum sentence for violating 18 U.S.C. § 1956 and an additional ten years for violating 31 U.S.C. § 5324, a total of thirty years. Similarly, an individual convicted of the offenses committed by Midtown could face two consecutive twenty-year incarceration terms for the two violations of 18 U.S.C. § 1956 and two consecutive incarceration terms of ten years for the violations of 31 U.S.C. § 5324, a total of sixty years.

The available fines further indicate that the corporate Defendants' offenses are extremely serious. The maximum available statutory fine for each Defendant, set pursuant to 18 U.S.C. § 3571(c) and 31 U.S.C. § 5324(d)(2),[5] leaves Chaplin's accountable for a total of $1,500,000 and Midtown accountable for a total of $3,000,000.

Furthermore, the Sentencing Guidelines set the range of fines applicable to each Defendant at a minimum of $1,200,000 each and a maximum of $2,400,000 each.

Thus, the Court finds that the available incarceration terms, the statutory maximum fines, and the Sentencing Guidelines fine range applicable to these Defendants compel the conclusion that the offenses were serious.

### 3. *Harm Caused by Chaplin's and Midtown*

■ The final *Browne* factor calls for an assessment of the harm that the corporate Defendants' conduct caused. Chaplin's and Midtown contend that because their offenses arose in the context of an undercover sting operation and because their

---

4. As with their argument under the first *Browne* factor, the corporate Defendants argue that the Court should assess the seriousness of their offenses by reference to the statutory penalties that stem from a violation of 31 U.S.C. § 5331 rather than a violation of 31 U.S.C. § 5324. For the same reasons noted above, the Court rejects this approach. Both Chaplin's and Midtown pleaded guilty to violating 31 U.S.C. § 5324, not 31 U.S.C. § 5331. Indeed, in its opinion, the Eleventh Circuit calculated the maximum applicable statutory fines to the corporate Defendants by specifically referencing 31 U.S.C. § 5324. *See Seher*, 562 F.3d at 1371 n. 29. Accordingly, it is irrelevant what statutory penalties a defendant may be subject to for violating 31 U.S.C. § 5331, as that is not the statute under which the corporate Defendants were indicted and convicted.

5. Both the Government and Defendants state that the maximum statutory fine for Chaplin's is $1,000,000 and for Midtown is $2,000,000. However, it is apparent to the Court that the parties have miscalculated the fine range. Based upon 18 U.S.C. § 3571(c)(3) and 31 U.S.C. § 5324(d)(2), the Court finds that the maximum statutory fine for Chaplin's is $1,500,000 and for Midtown is $3,000,000. Indeed, the Eleventh Circuit expressly found these to be the appropriate figures. *See Seher*, 562 F.3d at 1371, 1371 n. 29. The Court also rejects Defendants' suggestion that the aggravation provision set forth in 31 U.S.C. § 5324(d)(2) should not apply in calculating the fine. The Eleventh Circuit reasoned that the aggravated provision should apply, and Defendants pleaded guilty to these offenses.

liability for Toros Seher's criminal acts was vicarious, their conduct resulted in no harm. The Court disagrees.

The Court rejects the notion that a defendant charged in an undercover sting operation with violating 31 U.S.C. § 5324 and 18 U.S.C. § 1956 causes no harm. Although Seher's activities at the Gold and Diamond Depot in the mid-to-late 1990s with Kimberly and Dexter Hubbard, Garrette Ragland, Walter Johnson, Delano McDowell, Clifton Manning, and others first drew the Government's attention, the evidence shows that Seher engaged in wrongful conduct on the corporate Defendants' behalf that exceeded that reflected within the indictment's four corners.

Specifically, after leaving the Gold and Diamond Depot and while working for Chaplin's in 2003, Seher sold a wedding set to Kimberly Hubbard in exchange for approximately $23,000 in cash drug proceeds. Additionally, Hubbard renewed her contacts with Seher on April 27, 2005, while he was a Chaplin's employee, to discuss a diamond cross pendant that he was to make for her in a transaction that Chaplin's, through Seher, knew would be financed with drug proceeds.

Kareena Eichelberger's presence at Chaplin's when Kimberly Hubbard and the undercover agent went there on April 28, 2005, offers further support for the proposition that the corporate Defendants' criminal conduct was broader than the indictment reflects. During that meeting, video footage shows Eichelberger, Walter Johnson's wife, arguing with Seher about a purchase. This event offers further support for the proposition that Seher continued to do business with drug dealers and their wives well into 2005, a practice that he continued throughout his employment with Chaplin's and Midtown.

Such a reality militates heavily against the notion that this Court should disregard the corporate Defendants' violations of 18 U.S.C. § 1956 and focus solely on their violations of 31 U.S.C. § 5324. Likewise, the same reality also weighs against concluding that the corporate Defendants caused no harm because the injury inherent in a 31 U.S.C. § 5324 violation is informational.

By allowing Seher to continue to do business with people such as Kimberly Hubbard, Kareena Eichelberger, and the undercover agent, Chaplin's and Midtown not only compromised the integrity of the United States financial system by providing an avenue for ill-gotten gains to enter the legitimate stream of commerce undetected, but also garnered profits from doing so. By knowingly accepting funds that they knew or believed were drug proceeds, Chaplin's and Midtown intended to and did thwart the primary objective of Congress's money laundering and currency reporting laws—laws specifically designed to make money generated by drug dealers such as Dexter Hubbard and Walter Johnson worthless.

In sum, after careful review of the record evidence in light of the *Browne* factors, the Court finds that the corporate Defendants have failed to carry their burden of showing that the forfeiture sought by the Government violates the Eighth Amendment.

### 4. *Value of Property*

■ Having found that the corporate Defendants fall into the class of persons at whom the statutes were principally directed; that the penalties imposed for their violations reflect judgments that both Congress and the United States Sentencing Commission find those offenses extremely serious; and having catalogued the harms that their behavior caused as extremely grave, the Court must next weigh those

findings against the value of the property that the Government seeks to forfeit.

During the hearing on December 15, 2009, the parties presented the Court with a range of values regarding the inventory of the two businesses. The corporate Defendants contend that the Court should value the inventory by using the Government's fair market values at the time of the appraisal in August 2009. The Government counters that the proper approach is to use the wholesale value of the inventory at the time of the seizure in July 2006.

After review, the Court agrees with the Government. First, the Court finds that July 2006 is the relevant time period at which to value the inventory. Because the corporate Defendants did not pay 2009 prices for the inventory subject to forfeiture, using those higher values as opposed to the lower 2006 wholesale figures would overvalue the forfeiture's punitive effects, creating a windfall to which the corporate Defendants are not entitled. *See United States v. Betancourt,* 422 F.3d 240, 251 (5th Cir.2005) (deeming appreciation of forfeitable property irrelevant to Eighth Amendment analysis and requiring drug dealer who used fraction of proceeds from $76,000 drug offense to purchase lottery ticket to forfeit $5.4 million in lottery winnings); *see also United States v. Parcel,* 287 F.Supp.2d 45, 60 (D.D.C.2003); *United States v. Young,* No. 5:96–cr–2, 2001 WL 1644658, at *2 n. 3 (M.D.Ga. Dec. 21, 2001).

Second, the Court rejects the corporate Defendants' contention that a fair market value (retail) standard should apply. A retail standard would value the inventories at the price that the corporate Defendants hoped to garner on the market, thus add-ing a speculative element that inappropriately inflates the punitive effects of any forfeiture by crediting the corporate Defendants as wrongdoers with profits never realized.[6] *See United States v. Lively,* 20 F.3d 193, 200–03 (6th Cir.1994) (considering the defendant's challenge to order of restitution for retail value of goods ordered from victim in mail fraud scam and imposing burden absorbing unfavorable valuation on wrongdoer).

Consequently, the Court finds that the 2006 wholesale inventory values most accurately quantify the real costs of what the corporate Defendants stand to lose. *Accord United States v. Robertson,* 493 F.3d 1322, 1333 (11th Cir.2007) (district court had discretion to use wholesale value of software that the defendant stole to measure harm that crime worked on corporate victim for purposes of setting mandatory restitution).

Additionally, given that third party contractors with no interest in the outcome performed the Government's appraisal, whereas Sahin Corluoglu and Parseg Seher, Chaplin's sole stockholders, performed the corporate Defendants' appraisals, the Court finds that the Government's calculations of the 2006 wholesale values are the more reliable figures. Thus, according to these calculations, the 2006 wholesale value of Chaplin's inventory is $1,877,262, and the 2006 wholesale value of Midtown's inventory and bank account is $1,218,410.70.

▮▮▮ Next, the Court must assess whether the corporate Defendants have met their burden of showing that the value of the forfeitable properties is grossly disproportional to the gravity of their offenses. A "strong presumption" of consti-

---

6. Not only would using the retail figures afford a windfall to the corporate Defendants, it would also fail to take into account that the consent restraining order allowed them to use otherwise forfeitable proceeds from sales of released inventory to pay their operating expenses.

tutionality attaches when the value of property to be forfeited falls "within the range of fines prescribed by Congress." *United States v. 817 NE 29th Drive, Wilton Manors, Fla.,* 175 F.3d 1304, 1309 (11th Cir.1999). Importantly, although a forfeiture falling "within the congressionally mandated range of fines is presumptively constitutional," the converse is not necessarily true. *See Wilton Manors,* 175 F.3d at 1309. Indeed, Congress's decision to authorize punishment by both fine and forfeiture for a given offense is good evidence that even a forfeiture that exceeds the statutory fine range can be permissible. *Id.* at 1309 n. 9.[7]

◼ Additionally, given the United States Sentencing Commission's "extensive research, thought, input from commentators, and experience," a forfeiture value falling "within or near the permissible" Sentencing Guideline range is "almost certainly" proper. *Id.* at 1310; *United States v. 10380 SW 28th Street, Miami, Fla.,* 214 F.3d 1291, 1295 (11th Cir.2000); *see also United States v. Puche,* 350 F.3d 1137, 1154 (11th Cir.2003). Indeed, given that the Sentencing Commission designed the Guidelines "to proportion punishments to crimes with even greater precision than criminal legislation[,]" the Eleventh Circuit has emphasized the importance of considering Guideline fine calculations in determining whether a fine is excessive. *Wil-*

ton Manors,* 175 F.3d at 1310; *United States v. Fifty Nine Thousand Dollars,* 282 Fed.Appx. 785, 789 (11th Cir.2008).

Mindful of these principles, the Court considers the following comparisons of each corporate Defendants' directly forfeitable property values to the maximum statutory fines and the fine ranges that the Sentencing Guidelines set:

| Defendant | Total Value of Property | Maximum Statutory Fine | Guideline Fine Range |
|---|---|---|---|
| Chaplin's | $1,877,262 | $1,500,000 | $1.2–2.4 million |
| Midtown | $1,281,410.70 | $3,000,000 | $1.2–2.4 million |

Recognizing the corporate Defendants' membership in the targeted class, the seriousness nature of their offenses and the gravity of the harms that they caused, and comparing those factors to the value of the properties subject to forfeiture, the Court concludes that the value of each corporate Defendants' directly forfeitable property is proportional to the gravity of their crimes and hence that the forfeitures sought in this case do not violate the Eighth Amendment. Consequently, it is hereby ordered that Chaplin's shall forfeit all of its inventory to the United States and that Midtown shall forfeit all of its inventory and all funds seized from its bank account to the United States.[8]

## III. Conclusion

For the foregoing reasons, IT IS HEREBY ORDERED that:

---

7. The corporate Defendants rely upon *Wilton Manors* for the proposition that the Court should add the Defendants' fines to the value of their inventories prior to assessing proportionality. *See Wilton Manors,* 175 F.3d at 1309 n. 9. This argument ignores not only that *Wilton Manors* expressed such a calculation as a possible but not mandatory approach, but also that in the intervening ten years, no court has cited *Wilton Manors* for this proposition. Consequently, the Court declines to add the corporate Defendants' fines to the value of their inventories prior to assessing proportionality.

8. In reaching this conclusion, the Court is cognizant of the goals at sentencing, only one of which is punishment. 18 U.S.C. § 3553(a). Furthermore, the Court notes that it accounted for the effects of these forfeitures when it sentenced Defendants, for despite the Guidelines' recommended fine range, Chaplin's sentence was mitigated to a fine that fell between .8 and 4.1 percent of the Guidelines recommendation, and Midtown's fell between 10.41 and 20.8 percent of the Guidelines recommendation.

1. The inventories of Chaplin's and Midtown and all funds seized from Midtown's bank account are forfeited to the United States;

2. A money judgment is entered against Chaplin's for $22,000 and against Midtown for $32,800 in connection with counts two through seven;

3. In accordance with the Court's August 17, 2007, 574 F.Supp.2d 1368 forfeiture Order, a money judgment against Toros Seher is entered in the amount of $1,610,400 [9] in connection with count one;

4. In accordance with the Court's August 17, 2007 forfeiture Order, a money judgment against Toros Seher is entered in the amount of $54,800 in connection with counts two through seven;

5. In accordance with the Court's August 17, 2007 forfeiture Order, Seher's real property located at 213 16th Street, Apt. 2, Atlanta, Georgia may be forfeited as a substitute asset pursuant to 21 U.S.C. § 853(p); [10] and

6. Because the Government has made reasonable efforts to locate the specific criminal proceeds derived from each Defendant, the Government may, pursuant to 21 U.S.C. § 853(p), satisfy any outstanding personal money judgment that Chaplin's owes out of the funds that were seized from its bank account.

---

9. The personal money judgment against Seher was discussed in the Court's August 17, 2007 forfeiture Order and was affirmed by the Eleventh Circuit.

10. The forfeiture of Seher's real property as a substitute asset was affirmed by the Eleventh Circuit.