[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 10-10832
_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JULY 13, 2011
JOHN LEY
CLERK

D.C. Docket No. 1:06-cr-00322-TCB-CCH-2

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

versus

CHAPLIN'S, INC.,

Defendant - Appellant.

_____

Appeal from the United States District Court
for the Northern District of Georgia

_____

(July 13, 2011)

Before TJOFLAT, HILL and ALARCÓN,[*] Circuit Judges.

TJOFLAT, Circuit Judge:

The sole issue in this appeal is whether the forfeiture order imposed against Chaplin's, Inc. ("Chaplin's"), after Chaplin's was convicted of charges under 18 U.S.C. § 1956 and 31 U.S.C. § 5324, violates the Excessive Fines Clause of the Eighth Amendment.[1]  We find that it does not, and we affirm the district court's judgment.

## I.

## A.

The facts of this case were extensively set out in our previous opinion that affirmed Chaplin's convictions, see United States v. Seher, 562 F.3d 1344, 1350–54 (11th Cir. 2009) ("Seher II"), and we will relay only the facts essential to Chaplin's Eighth Amendment challenge.

Chaplin's is a jewelry store located in Atlanta, Georgia, and owned by Parsig Seher.  Parsig Seher's brother, Toros Seher ("Seher"), occasionally worked at Chaplin's and also owned his own jewelry store in Atlanta, Chaplin's Midtown

---

[*] Honorable Arthur L. Alarcón, United States Circuit Judge for the Ninth Circuit, sitting by designation.

[1] The Eighth Amendment reads: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted."  U.S. Const. amend. VIII.

("Midtown"). Between 1996 and 2002, Seher sold jewelry in cash-based transactions at a third location to people he knew to be drug dealers. These sales were often structured to avoid any individual payments in excess of $10,000, which would have required Seher, as the store's agent and recipient of the cash, to file a report with the federal government ("Form 8300"), containing information about the buyer, such as the buyer's name and address. 31 U.S.C. § 5331(a)–(b).

Federal investigators learned of Seher's activities and arranged a controlled-buy. During 2005 and 2006, an Internal Revenue Service ("IRS") investigator met with Seher on multiple occasions at both Chaplin's and Midtown.[2] Under the pretense of being a narcotics trafficker, the investigator bought expensive jewelry from Seher without completing Form 8300.

At Chaplin's, the investigator purchased from Seher a set of wedding rings from Chaplin's inventory. During negotiations for that purchase, the investigator intimated that he was involved in the drug trade. Seher initially suggested that the investigator pay for the rings in three separate bundles.[3] This payment structure

---

[2] On several of those occasions, the investigator was accompanied by Kimberly Hubbard, the wife of a drug dealer with whom Seher had previously done business.

[3] The bundles would be delivered by three people: (1) the IRS investigator; (2) Hubbard; and (3) Kareena Eichelberger, the wife of yet another drug dealer with whom Seher had previously done business, and who happened to be in Chaplin's on the day of the controlled-buy.

would allow Seher to avoid filing Form 8300 on Chaplin's behalf and the IRS investigator to avoid disclosing personal information to the federal government.

Several months later, again at Chaplin's, the investigator and Seher completed their negotiations for the rings and settled on a price. Seher communicated the price as "$220"; however, the investigator understood this quote truly to mean $22,000. The investigator handed Seher $3,000 in cash, and Seher returned a receipt, of sorts. On a yellow note, Seher had written the numbers "2200.00," "1900.00," and "300.00," which the investigator understood as representing the total purchase price, $22,000, the outstanding balance, $19,000, and the investigator's downpayment, $3,000.

The investigator returned to Chaplin's the following day to pick up the rings and complete the transaction. Seher led the investigator to Chaplin's back-room. There, the investigator handed Seher $19,000 in cash, which Seher immediately put into a safe. Before leaving Chaplin's, the investigator told Seher that he did not want to complete any paperwork for the transaction; Seher assured him that there would not be any paperwork. Nobody at Chaplin's completed and filed Form 8300 for the rings transaction.

B.

4

Chaplin's was indicted on seven counts related to Seher's sales and failure to file Form 8300. The indictment[4] alleged, among other things, that Chaplin's (1) "knowingly and intentionally conduct[ed] a financial transaction . . . involving property represented to be the proceeds of specified unlawful activity" ("money laundering"), in violation of 18 U.S.C. §§ 1956(a)(3)(B) and (C);[5] and (2) "knowingly and intentionally cause[d] a nonfinancial trade or business to fail to file a report required under [31 U.S.C.] Section 5331," in violation of 31 U.S.C. §§ 5324(b)(1) and (d)(2).[6] Seher's conduct and knowledge formed the basis of the

---

[4] We refer to the superceding indictment as the "indictment."

[5] These provisions provide:

Whoever, with the intent—
> . . . .
>> (B) to conceal or disguise the nature, location, source, ownership, or control of property believed to be the proceeds of specified unlawful activity; or
>> (C) to avoid a transaction reporting requirement under State or Federal law,
> conducts or attempts to conduct a financial transaction involving property represented to be the proceeds of specified unlawful activity, or property used to conduct or facilitate specified unlawful activity, shall be fined under this title or imprisoned for not more than 20 years, or both. For purposes of this paragraph . . . the term "represented" means any representation made by a law enforcement officer or by another person at the direction of, or with the approval of, a Federal official authorized to investigate or prosecute violations of this section."

18 U.S.C. § 1956(a)(3)(B)–(C). We will refer to this statute as "Section 1956" or "§ 1956."

[6] These provisions provide:

> (b) Domestic Coin and Currency Transactions Involving Nonfinancial Trades or Businesses.— No person shall, for the purpose of evading the report requirements

indictment.  Because Seher committed the violations during the course of his employment at Chaplin's, Chaplin's was vicariously liable for his actions.[7]  The indictment also sought forfeiture of "any and all property involved in" these offenses, including all of Chaplin's inventory.  Both counts provided for forfeiture, with the money laundering count governed by 18 U.S.C. § 982(a)(1),[8] and the reporting violation governed by 31 U.S.C. § 5317(c)(1).[9]

---

of section 5331 or any regulation prescribed under such section—
        (1) cause or attempt to cause a nonfinancial trade or business to fail
        to file a report required under section 5331 or any regulation
        prescribed under such section;
. . . .
(d) Criminal Penalty.—

        . . . .
        (2) Enhanced penalty for aggravated cases.—   Whoever violates
        this section while violating another law of the United States . . .
        shall be fined twice the amount provided in subsection (b)(3) or
        (c)(3) (as the case may be) of section 3571 of title 18, United States
        Code, imprisoned for not more than 10 years, or both.

31 U.S.C. §§ 5324(b)(1), (d)(2).  We will refer to this statute as "Section 5324" or "§ 5324."

[7]  The indictment also charged Chaplin's with conspiracy to launder money under 18 U.S.C. § 1956(c)(1), and other violations of § 1956 and § 5324 based on jewelry sales that took place at Midtown.

[8]  18 U.S.C. § 982(a)(1) provides: "The court, in imposing sentence on a person convicted of an offense in violation of section 1956 . . . of this title, shall order that the person forfeit to the United Sates any property, real or personal, involved in such offense, or any property traceable to such property."

[9]  31 U.S.C. § 5317(c)(1) provides: "The court in imposing sentence for any violation of section . . . 5324 of this title . . . shall order the defendant to forfeit all property, real or personal, involved in the offense and any property traceable thereto."

6

The case went to trial in February 2007. At the close of the evidence, but before the jury was charged, Chaplin's pled guilty to the reporting violation. During the plea colloquy, however, Chaplin's attempted to plead guilty to a violation of 31 U.S.C. § 5331,[10] not to § 5324. Section 5331(a) requires any person "engaged in a trade or business" to report any transactions involving more than $10,000 in currency—i.e., to file Form 8300. Chaplin's, as the entity selling jewelry, was under an obligation to file Form 8300. As a result, it argued that § 5324 could not apply to it because § 5324(b)(1) punishes anyone who, "for the purpose of evading the report requirements of section 5331[,] . . . cause[s] or attempt[s] to cause a nonfinancial trade or business to fail to file a report required under section 5331." Because Chaplin's was the entity required to file the report, a conviction under § 5324 would mean that Chaplin's caused itself to fail to file the necessary report. Chaplin's argued that the Government only prosecuted it under § 5324 because that section, unlike § 5331, provides for forfeiture.

The Government disagreed with Chaplin's argument and insisted that it intended to prosecute Chaplin's under § 5324, not § 5331. The district court agreed that the Government was entitled to prosecute the case as it saw fit; the court informed Chaplin's that it could either proceed to a verdict and appeal or

---

[10]  We will refer to this provision as "Section 5331" or "§ 5331."

7

plead guilty to the charge as set out in the indictment. Given this choice, Chaplin's pled guilty to the § 5324 count.[11] The jury was then instructed on the § 1956 count, and subsequently found Chaplin's guilty.

After the trial, the Government moved for a preliminary order of forfeiture against Chaplin's entire inventory. According to the Government, the inventory was "involved in" the money laundering and reporting offenses because it provided Seher's—and, vicariously, Chaplin's—money laundering operation with an "air of legitimacy." Chaplin's argued that its inventory was not "involved in" the relevant offenses, and that such a forfeiture would violate the Eighth Amendment's prohibition of excessive fines. On August 17, 2007, the district court granted the Government's motion and entered a preliminary order of forfeiture against Chaplin's inventory pursuant to Federal Rule of Criminal Procedure 32.2(b), but did not address Chaplin's Eighth Amendment argument. United States v. Seher, 574 F. Supp. 2d 1368, 1369–71 (N.D. Ga. 2007) ("Seher I"). In addition to Chaplin's inventory, the district court ordered Chaplin's to forfeit $22,000 in the form of a personal money judgment, which represented "the

---

[11] At this point, the district court also dismissed the conspiracy charge and granted Chaplin's judgments of acquittal on the charges related to sales at Midtown.

amount of the undercover funds that were never recovered by the Government."[12]

Id. at 1371.

The district court then held a sentencing hearing on August 22, 2007. The Presentence Investigation Report ("PSR") prepared by the United States Probation Office calculated Chaplin's Total Offense Level to be 20 under the Sentencing Guidelines. The money laundering charge, as the "most serious" of the two counts, see United States Sentencing Commission, Guidelines Manual, § 3D1.3(a) (Nov. 1, 2006), drove the Guidelines fine range; the PSR recommended a fine from $650,000 to $1,300,000. At the sentencing hearing, the district court took into account Chaplin's ability to pay, along with the forfeiture order, and sentenced it to pay a $100,000 fine—$50,000 for each count—and to serve five years of probation.

---

[12] The district court initially ordered Seher, Midtown, and Chaplin's, jointly and severally, to pay a $54,800 personal money judgment as forfeiture, which represented the combined amount of unrecovered funds from the controlled-buys at Chaplin's and Midtown. United States v. Seher, 574 F. Supp. 2d 1368, 1371 (N.D. Ga. 2007) ("Seher I"). Chaplin's also appealed this portion of the district court's judgment in its first appeal to this court. In our 2009 opinion, we vacated that money judgment because the district court did not make any findings regarding the propriety of piercing Chaplin's corporate veil. United States v. Seher, 562 F.3d 1344, 1372 (11th Cir. 2009) ("Seher II"). On remand, the district court found that Chaplin's operated as a distinct entity and therefore should be liable only for the $22,000 money judgment, which related to the $22,000 transaction underlying its conviction. United States v. Seher, 686 F. Supp. 2d 1323, 1327 (N.D. Ga. 2010) ("Seher III").

Chaplin's appealed its conviction and sentence, specifically the forfeiture order. This court affirmed the conviction, but vacated the forfeiture order. Seher II, 562 F.3d at 1373–74. Under the forfeiture statutes, Chaplin's inventory was "involved in" the relevant offenses, and therefore was properly subject to forfeiture. Id. at 1369. We noted, however, that the district court did not address Chaplin's Eighth Amendment defense, and remanded the case to the district court to rule on that issue. Id. at 1370–72, 1373–74.

On remand, the parties submitted briefs to the district court on the Eighth Amendment issue. Chaplin's argued that the forfeiture order was excessive under the three factor test set out in United States v. Browne, 505 F.3d 1229 (11th Cir. 2007).[13] The district court disagreed and reinstated the forfeiture order against Chaplin's inventory. United States v. Seher, 686 F. Supp. 2d 1323, 1327–33 (N.D. Ga. 2010) ("Seher III"). Under Browne, the court first determined that Chaplin's was within the class of persons at whom § 5324 and § 1956 were principally directed. Id. at 1328–29. It then determined that the statutory maximum sentences for these offenses were 20 years and 10 years imprisonment

---

[13] As explained in part II, infra, these factors are: "(1) whether the defendant falls into the class of persons at whom the criminal statute was principally directed; (2) other penalties authorized by the legislature (or the Sentencing Commission); and (3) the harm caused by the defendant." United States v. Browne, 505 F.3d 1229, 1281 (11th Cir. 2007).

for violating § 1956 and § 5324, respectively, and a maximum statutory fine of $1,500,000.[14]  Id. at 1329.  The court finally noted that Chaplin's conduct was very harmful, even though the act for which it was indicted was a government-controlled-buy, as other evidence in the record suggested that Seher's illicit transactions on Chaplin's behalf extended beyond the indicted incident.  Id. at 1329–30.  Weighing these factors against the value of Chaplin's forfeited property, $1,877,262, the court found that the forfeiture was not grossly disproportionate and therefore not violative of the Eighth Amendment.  Id. at 1330–32.  The court also noted in a footnote that its lenient sentence of $100,000 in fines was predicated on the validity of the forfeiture order.  Id. at 1332 n.8.

## II.

On appeal, Chaplin's contends that the order forfeiting its inventory is an excessive fine in violation of the Eighth Amendment.[15]  A forfeiture order is

_____

[14]  The maximum fine against corporate defendants is $500,000 per felony conviction.  18 U.S.C. § 3571(c)(3).  Section 5324, however, doubles the maximum fine if the defendant "violates this section while violating another law of the United States."  31 U.S.C. § 5324(d)(2).  Here, Chaplin's violated § 5324 while also violating § 1956, thereby triggering the doubled penalty for the § 5324 count.
The district court's order incorrectly stated that Chaplin's fine range under the Sentencing Guidelines was $1,200,000 to $2,400,000.  Seher III, 686 F. Supp. 2d at 1329.  The Government concedes that this higher figure was incorrect, and that the proper fine range under the Guidelines is $650,000 to $1,300,000.

[15]  Our analysis assumes, but does not hold, that the Eighth Amendment applies to corporations.  The Supreme Court has never held that this amendment applies to corporations.  See Browning-Ferris Inds. of Vt., Inc. v. Kelco Disposal, Inc., 492 U.S. 257, 276 n.22, 109 S. Ct.

11

unconstitutionally excessive when it is "grossly disproportional to the gravity of a defendant's offense." United States v. Bajakajian, 524 U.S. 321, 334, 118 S. Ct. 2028, 2036, 141 L. Ed. 2d 314 (1998). This standard narrows the judicial role in assessing the excessiveness of forfeiture orders; rather than strict proportionality, we review fines only for gross disproportionality. Id. at 337, 118 S. Ct. at 2037. Our narrowed role acknowledges principles of institutional competence: proportionality analyses are "inherently imprecise" and best kept within the province of legislatures, not courts. See id. at 336, 118 S. Ct. at 2037 ("[J]udgments about the appropriate punishment for an offense belong in the first instance to the legislature. . . . [A]ny judicial determination regarding the gravity of a particular criminal offense will be inherently imprecise.").

The parties and some decisions from this court refer to three factors, articulated in United States v. Browne, 505 F.3d 1229 (11th Cir. 2007), that guide our gross-disproportionality inquiry: "(1) whether the defendant falls into the class of persons at whom the criminal statute was principally directed; (2) other

---

2909, 2920 n.22, 106 L. Ed. 2d 219 (1989). But cf. First Nat'l Bank of Boston v. Bellotti, 435 U.S. 765, 778, 778 n.14, 98 S. Ct. 1407, 1416, 55 L. Ed. 2d 707 (1978) (recognizing that the First Amendment applies to corporations). Because we find that the forfeiture order is not an excessive fine, we need not decide this antecedent issue.

penalties authorized by the legislature (or the Sentencing Commission); and (3) the harm caused by the defendant," id. at 1281.[16]

The murkiness of these factors demonstrates the inherent difficulty of monetizing the gravity of an offense. Our cases have therefore assigned great weight to the fines approved by Congress and the Sentencing Commission. Congress, as a representative body, can distill the monetary value society places on harmful conduct; forfeitures falling below the maximum statutory fines for a given offense therefore receive a "strong presumption" of constitutionality. United States v. 817 N.E. 29th Drive, Wilton Manors, Fla., 175 F.3d 1304, 1309 (11th Cir. 1999). The Sentencing Guidelines reflect institutional expertise and monetize culpability "with even greater precision than criminal legislation"; "a defendant would need to present a very compelling argument" to suggest that a forfeiture within the guideline range is constitutionally excessive. Id. at 1310.

These general principles, however, do not suggest that forfeitures above either the statutory maximum fine or the Guidelines range are presumptively invalid. Id. at 1309 n.9. Instead, such forfeitures simply receive closer scrutiny,

---

[16] These factors are not an exclusive checklist, however. "[I]t would be futile to attempt a definitive checklist of relevant factors. The relevant factors will necessarily vary from case to case." United States v. One Parcel Prop. Located at 427 and 429 Hall St., Montgomery, Montgomery Cnty., Ala., 74 F.3d 1165, 1172 (11th Cir. 1996) (citations omitted).

but "[a] forfeiture far in excess of the statutory fine range . . . is likely to violate the Excessive Fine Clause." Id.; see also Bajakajian, 524 U.S. at 337–39, 118 S. Ct. at 2038 (holding that a forfeiture of $357,144 was excessive where the maximum fine under the Sentencing Guidelines was $5,000).

We begin our analysis with the first Browne factor—whether Chaplin's is among the principal targets of the forfeiture-authorizing statutes. Here, those statutes are the money laundering statute, § 1956, and the reporting violation, § 5324. Chaplin's argues that it was not the primary target of § 5324 because, as the institution required to file reports under § 5331, it could not "cause" itself to fail to file a report. While we appreciate the linguistic awkwardness of charging Chaplin's under § 5324, Chaplin's does not argue that it is not the principal target of the § 1956 money laundering count. Accordingly, we agree with the district court's conclusion that Chaplin's "stand[s] at the dead-center of [§ 1956's] targeted class" and therefore is the proper target of a forfeiture-authorizing statute.

The next Browne factor—the available sentences—suggests that Chaplin's was convicted of very serious crimes. If Chaplin's were a natural person, it would have faced statutory maximum incarceration terms of twenty years for violating § 1956 and ten years for violating § 5324. The statutory maximum fines for these two convictions are significant, totaling $1,500,000. The Sentencing Guidelines

14

fine range suggests a similar maximum punishment, ranging from $650,000 to $1,300,000.[17]

The last Browne factor—the harm caused by the defendant—also weighs in favor of the forfeiture order. Seher, on Chaplin's behalf, structured the $22,000 transaction to avoid filing Form 8300 because he believed the cash at issue represented the proceeds of drug sales. Attempting to hide drug money is harmful in and of itself. See Bajakajian, 524 U.S. at 339, 118 S. Ct. at 2039 (contemplating the harm "caused by a hypothetical drug dealer who willfully fails to report taking $12,000 out of the country in order to purchase drugs"). That the sale was the product of a government sting is irrelevant; § 1956(a)(3), for which Chaplin's was convicted, contemplates such a controlled-buy. The provision punishes certain transactions "involving property represented to be the proceeds of specified unlawful activity," and "the term 'represented' means any representation

---

[17] Chaplin's contends that $1,500,000 is the incorrect calculation for the statutory maximum fine. It again asserts its argument that the Government should have prosecuted it under § 5331, and not under § 5324, and that the maximum fine under § 5331 is $500,000. Combined with § 1956's $500,000 maximum fine, Chaplin's claims that the forfeiture order, valued at $1,877,262, should be compared with $1,000,000, and not with $1,500,000. This argument is unconvincing. Chaplin's pled guilty to § 5324; even if it was not the primary target of that offense, its guilty plea opened it to punishment authorized for violations of that offense. We are evaluating the forfeiture order for excessiveness; the available punishments under the statute to which Chaplin's pled guilty seem to be a sensible comparator. Furthermore, this argument does not disturb the $1,300,000 maximum fine under the Sentencing Guidelines, which was based on the § 1956 conviction.

15

made by a law enforcement officer . . . ."  18 U.S.C. § 1956(a)(3).  Congress

therefore contemplated the very situation here, and concluded that the conduct was

sufficiently serious to warrant 20 years imprisonment, a $500,000 fine, and

forfeiture of any property involved in the offense.

Chaplin's argues that the $22,000 transaction was an isolated event and is

the only conduct linking it to illegal activity.  Evidence in the record contradicts

this assertion, however.  First, the ring-purchasing transaction between Seher and

the IRS investigator spanned several months; the initial contact occurred on April

28, 2005, and the transaction concluded on August 25, 2005.[18]  This prolonged

time frame demonstrates that the transaction was not the product of one,

momentary lapse in individual judgment or corporate oversight.  See United States

v. Dodge Caravan Grand SE/Sport Van, 387 F.3d 758, 763 (8th Cir. 2004)

(considering "the extent and duration of the criminal conduct" in its Eighth

Amendment analysis (quoting United States v. Bieri, 68 F.3d 232, 236 (8th Cir.

1995))).

---

[18]  The sequence of events at Chaplin's proceeded in this order.  On April 28, 2005, the IRS investigator, along with Hubbard, met with Seher at Chaplin's; Seher showed the IRS investigator one set of rings and proposed structuring the transaction.  On July 21, 2005, the IRS investigator and Hubbard returned to Chaplin's, picked out a different set of rings, and agreed on the $22,000 price with Seher; the IRS investigator paid $3,000.  On July 22, 2005, the IRS investigator returned to Chaplin's, met with Seher in the back-room, and gave Seher the remaining $19,000 in cash; the investigator also picked up one of the two rings that day.  And, on August 25, 2005, the investigator picked up the second ring from Chaplin's.

Second, the IRS investigator purchased a Rolex watch from Seher with $12,800 in cash represented to be drug proceeds without completing Form 8300. Although this purchase was completed at Midtown, the IRS investigator first saw the watch during his July 21, 2005 visit to Chaplin's and then tried it on during a visit to Chaplin's on August 25, 2005. We may reasonably infer that Seher, or someone else, transported the watch from Chaplin's to Midtown, where Seher and the IRS investigator conducted another cash transaction using purported drug proceeds. This transaction implicates Chaplin's inventory in yet another drug-tainted attempt to evade federal currency reporting requirements.

Third, Seher's comments on July 22, 2005, suggest that he was not the only Chaplin's employee involved in the money-laundering operation. That day, the IRS investigator met with Seher in the back-room at Chaplin's to complete the $22,000 transaction. The IRS investigator handed Seher a stack of $19,000 in cash and repeatedly stated that he did not want his name on any forms, a reference to Form 8300. During the meeting, the IRS investigator noticed another Chaplin's employee working in the back-room—apparently fabricating jewelry—and expressed concern about the employee's presence. Seher mollified the

investigator's concerns by stating, "that's my partner, man."[19]  No evidence

suggests that this "partner" was anything but a Chaplin's employee; the record

therefore supports an inference that Seher's criminal conduct as a Chaplin's

employee extended beyond "the indictment's four corners."[20]

---

[19]  The transcript of the exchange reads:

Undercover: . . . . Hey, that guy in there is cool, huh?  That guy in there that's sitting there?
T[oros] Seher: That's my partner, man.
Undercover: Okay.  I'm just, you know — the game
T[oros] Seher: Listen, listen, listen to me, everybody here [unintelligible]
Undercover: The game is hot right now.
T[oros] Seher: Anybody that's behind here—and another thing . . . .

Seher's statements—"everybody here" and "[a]nybody that's behind here"—strongly suggest that the third person in the back-room of Chaplin's was "cool"—i.e., complicit in Seher's scheme.

[20]  The district court found that "the evidence show[ed] that Seher engaged in wrongful conduct on the corporate Defendants' behalf that exceeded that reflected within the indictment's four corners."  Seher III, 686 F. Supp. 2d at 1330.  The court pointed to three jewelry sales: (1) Seher sold a wedding set to Hubbard in exchange for approximately $23,000 in cash drug proceeds while working at Chaplin's in 2003; (2) Hubbard met with Seher at Chaplin's on April 27, 2005—the day before the IRS investigator met with Seher—to discuss the purchase of a diamond cross pendant; and (3) Eichelberger was seen arguing with Seher on April 28, 2005—the date that the IRS investigator first met with Seher—about a purchase.  Id.  These events, according to the court, "offer[] further support for the proposition that Seher continued to do business with drug dealers and their wives well into 2005, a practice that he continued throughout his employment with Chaplin's and Midtown."  Id.  Chaplin's contends that the evidence in the record does not support such findings.  But the evidence in the record supports the findings described in the text above, and those findings demonstrate that Chaplin's conduct was sufficiently criminal to justify the forfeiture order.  Because we may affirm the district court's judgement on any ground, we need not evaluate the district court's contested findings.  See Bankshot Billiards, Inc. v. City of Ocala, 634 F.3d 1340, 1349 (11th Cir. 2011) (affirming the district court's judgment on different grounds than that relied upon by the district court).

18

Also relevant to our analysis, beyond the Browne factors, is the interplay between the forfeiture order and the fine imposed by the district court. Chaplin's was subject to a statutory maximum fine of $1,500,000 and a Sentencing Guidelines fine range of $650,000 to $1,300,000. The district court did not impose a fine anywhere near these figures; it imposed a $100,000 fine. Its decision to do so was based on the fact that it had already ordered forfeiture of Chaplin's inventory. Seher III, 686 F. Supp. 2d at 1332 n.8 (N.D. Ga. 2010) ("[T]he Court notes that it accounted for the effects of these forfeitures when it sentenced [Chaplin's], for despite the Guidelines' recommended fine range, Chaplin's sentence was mitigated to a fine that fell between .8 and 4.1 percent of the Guidelines recommendation . . . ."). Had the district court believed that it could not constitutionally impose the full forfeiture, it likely would have increased the amount of the fine.

Against these factors we must weigh the value of the forfeited property. The parties agree that $1,877,262 is the accurate value of Chaplin's inventory. Chaplin's also argues that we should include within this calculation the $100,000 fine and the $22,000 money judgment, for a total of $1,999,262. Assuming, without deciding, that Chaplin's is correct in this regard, we do not find the forfeiture order to be grossly disprortionate to the gravity of Chaplin's crime.

19

This figure exceeds both the statutory maximum fine and the high-end of the Sentencing Guidelines fine range. The "strong presumption" of constitutionality therefore does not apply. But "Congress has authorized both a fine and forfeiture as part of the punishment for" both § 1956 and § 5324, which suggests that Congress "does not consider a punishment somewhat above the statutory fine range to be excessive." 817 N.E. 29th Drive, 175 F.3d at 1309 n.9. The extra $499,262 above the statutory maximum, a 33.3 percent increase, and $699,262 above the Guidelines fine, a 53.8 percent increase, fall well below the relative differences approved of in other cases. See, e.g., United States v. Castello, 611 F.3d 116, 118, 123–24 (2d Cir. 2010) (approving of $12,012,924 forfeiture where the statutory maximum sentence was $250,000, but where the defendant's illegal scheme involved more than $600 million); United States v. Jose, 499 F.3d 105, 112–13 (1st Cir. 2007) (approving a $114,948 forfeiture where the maximum Guidelines fine was $30,000); United States v. Ahmad, 213 F.3d 805, 817, 819 (4th Cir. 2000) (approving a $101,587.42 forfeiture where the statutory maximum fine was $250,000, but the fine under the Guidelines was only $5,000).

Furthermore, Chaplin's criminal conduct was more serious than the conduct at issue in cases where courts have found a forfeiture award excessive. In Bajakajian, for example, the defendant's only crime was a reporting offense; he

20

did not report that he was transporting more than $10,000 outside the United States. 524 U.S. at 324–25, 118 S. Ct. at 2032. The currency, however, was "unrelated to any other illegal activities"; the defendant was "not a money launderer, a drug trafficker, or a tax evader." Id. at 338, 118 S. Ct. at 2038. A forfeiture of $357,144, where the Guideline fine was only $5,000, was therefore excessive. And, in United States v. One Single Family Residence Located at 18755 North Bay Road, Miami, 13 F.3d 1493 (11th Cir. 1994), the owners of the forfeited residence had hosted an illicit poker game "involving some of [the owner's] relatives and associates." Id. at 1494. We held that the forfeiture of this property—which was valued at $150,000 and served as the principal residence of at least four people—violated the Eighth Amendment. The nature of this "gambling operation" was far outside the intended scope of the federal statute that criminalized illegal gambling; the owners' poker game was "sporadic" and "of insignificant monetary proportions." Id. at 1498 (quoting H.R. Rep. No. 91-1549, at 53 (1970), reprinted in 1970 U.S.C.C.A.N. 4007, 4029).

Chaplin's criminal conduct was not similarly benign. Unlike the Bajakajian defendant, Chaplin's was a money launderer that laundered drug proceeds. Its conduct was not a mere reporting violation. And, unlike the owners in One Single

21

Family Residence, Chaplin's criminal activities fell squarely within the intended scope of the federal money laundering statute, § 1956.

## III.

Taking all of these factors together, we cannot say that the forfeiture order was grossly disproportionate to the gravity of Chaplin's crime. The district court's judgment is, therefore,

AFFIRMED.