[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
SEP 21, 2011
JOHN LEY
CLERK

No. 10-14777
Non-Argument Calendar
_____

D.C. Docket No. 8:09-cr-00472-SCB-AEP-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

PETER JAMES PORCELLI, II,
a.k.a. Peter James,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

(September 21, 2011)

Before BARKETT, MARCUS and FAY, Circuit Judges.

PER CURIAM:

Peter James Porcelli, II, appeals his sentence for one count of mail fraud, in violation of 18 U.S.C. § 1341. He raises four issues on appeal. First, he argues that the district court erred in applying the U.S.S.G. § 3B1.3 offense-level enhancement for abuse of trust or use of a special skill, particularly in light of its simultaneous application of the § 3B1.1 aggravated-role enhancement. Second, he claims that the financially distressed victims facing home foreclosure were not "vulnerable victims" for purposes of § 3A1.1(b)(1). Third, he contends that the portion of the forfeiture money judgment that exceeded the loss amount constituted a violation of the Excessive Fines Clause of the Eighth Amendment. Finally, he argues that the decision to impose the instant sentence to run consecutively to his sentence in a Southern District of Illinois telemarketing-fraud case was substantively unreasonable. For the reasons set forth below, we affirm.

I.

From at least December 2004 through January 2007, Porcelli and his unindicted co-conspirators used the entities The Safe Harbour Foundation of Florida, Inc. ("Safe Harbour"), Silverstone Financial, LLC ("Silverstone Financial"), Silverstone Lending, LLC ("Silverstone Lending"), and Keystone Financial ("Keystone") to defraud distressed homeowners out of the equity in their homes through fraudulent lending practices. Porcelli and others formed Safe

2

Harbour in December 2004.  Safe Harbour's Articles of Incorporation claimed that its purpose was to "help save homeowners from foreclosure by introducing them to lenders," and Porcelli incorrectly advertised it as a nonprofit organization.  At that time, Porcelli and the others were subject to a federal-court injunction that prohibited them from offering lending services to the public.  The injunction arose from a Federal Trade Commission ("FTC") enforcement action, which was based on the acts of Porcelli and others in defrauding customers by marketing false credit opportunities.  Porcelli and others formed Silverstone Financial in December 2004 and Silverstone Lending in June 2005.  On June 14, 2005, Porcelli applied for Silverstone Lending's Florida license to be a Mortgage Lender.  Silverstone Lending became a Correspondent Lender and Porcelli was licensed as its Principal Representative.

Porcelli and the others searched for homeowners who were in jeopardy of losing their homes through foreclosure, specifically targeting those who still had equity in their homes.  The conspirators sent the victims marketing mailings from Safe Harbour that advertised it as a nonprofit "foreclosure relief" corporation.  The mailed flyers contained numerous misrepresentations and instances of deceptive wording, such as:

"We have all the funds available to pay your bills and save your home from foreclosure, GUARANTEED!"

"Don't lose your home"

"Guaranteed solution to stay in your home"

"Immediate relief from financial pressures"

"Stop the harassment"

"Save your credit"

"Safe Harbour Foundation is a NON-PROFIT Corporation, We can help you!  Timing is critical, let us help you survive the FORECLOSURE STORM!"

"The Safe Harbour Foundation has been established to give people a second chance when no one else will.  You don't have to file bankruptcy we can still help.  Our goal is to keep you in your home.  Be careful of other companies who look to profit from your misfortune."

"Watch for these warning signs...Don't be the next victim!
      "- Investment Sharks -These people are predators that want you to fail so that they can benefit from your loss.  Do not respond to these people's letters.
      "- Quick Money offers - Do not short sell your home.  Do not be tricked into easy money to get out of your mortgage and ruin your credit ratings.
      "- Keep Swimming - Do not make the mistake of thinking this will work itself out.  Take action and let the Safe Harbour Foundation pull you to safety."

The flyers advised homeowners to call "Peter James," Porcelli's alias. In addition, Porcelli and the others obtained victims' business through Safe Harbour's website, which advised homeowners to call "Kyle Reid," a co-conspirator's alias.

In response to the advertisements, and believing that Safe Harbour was a nonprofit organization as advertised, distressed homeowners called "Peter James" for advice. Porcelli and others interviewed the homeowners to determine how much equity they had in their property and the amount of arrearage on their mortgages. If these parameters met certain criteria, the conspirators promised the homeowners that Safe Harbour could find a lender to make up the arrearage and help them to avoid foreclosure. Safe Harbour then arranged for the lender, most often Silverstone Lending, to provide a short-term, extremely high-cost loan to each homeowner, which would be used to pay the arrearage. Although most homeowners needed only a few thousand dollars to avoid foreclosure, Safe Harbour arranged loans that included finance charges, origination fees, and underwriting fees, all of which immensely increased the sizes of the loans. The charges and fees were received by Safe Harbour, Silverstone Lending, Silverstone Financial, Keystone, and other entities controlled by Porcelli and the co-conspirators.

5

Additionally, the loans included a purchase option to be exercised by the lender upon default by the borrower. The option purchase price was calculated by subtracting the homeowner's equity from the estimated value of the home, thus allowing the conspirators to obtain all of the equity in the home by simply paying off any liens senior to their own, with little or no money going to the homeowner. Thus, a homeowner who fell into default lost the home and all of the equity in it.

Porcelli was indicted in 2009 on one count of mail fraud, in violation of 18 U.S.C. § 1341, and pled guilty without a plea agreement. The indictment included a forfeiture provision.

The probation officer calculated that 68 homeowner-victims borrowed a total of approximately $1.8 million. Of that amount, approximately $1.2 million constituted fraudulent loan fees and costs, and, thus, was the "loss and restitution" amount owed to the victims. Co-conspirator Kyle Reid Kimoto, the creator and leader of the conspiracy, had taught Porcelli the mechanics of the conspiracy. Porcelli was a manager-supervisor of the conspiracy and helped to form and operate the corporate entities involved.

Porcelli was subject to a base offense level of 7, pursuant to U.S.S.G. § 2B1.1(a)(1), a 16-level enhancement for a loss amount of more than $1,000,000 but less than $2,500,000, pursuant to § 2B1.1(b)(1)(I), and a 4-level enhancement

6

for an offense involving 50 or more victims, pursuant to § 2B1.1(b)(2)(B). Because the offense conduct violated an injunction, another two levels were added pursuant to § 2B1.1(b)(8). The financially distressed homeowners were considered "vulnerable victims" for purposes of the two-level enhancement in § 3A1.1(b)(1), and another three levels were applied pursuant to the aggravated-role enhancement in § 3B1.1(b). Additionally, the probation officer stated that obtaining and maintaining the mortgage-lending licenses required adherence to fiduciary standards and practices. Thus, the offense involved the abuse of a position of trust, and Porcelli was subject to a two-level increase under § 3B1.3. With a three-level reduction for acceptance of responsibility, pursuant to § 3E1.1(a)-(b), Porcelli had a total offense level of 33.

Porcelli received 3 criminal-history points and, thus, was in criminal history category II, due to his 2007 guilty plea in the Southern District of Illinois to 19 charges arising from a fraudulent telemarketing scheme. That scheme involved using multiple corporations to sell fraudulent credit cards to consumers, resulting in a total net loss of more than $12 million to more than 165,000 victims.

Porcelli was subject to statutory maximum penalties of 20 years' imprisonment, 3 years' supervised release, and $250,000 in fines. He faced guideline ranges of 151 to 188 months' imprisonment, 2 to 3 years' supervised

7

release, and $17,500 to $175,000 in fines. The probation officer noted that Porcelli might be eligible for a downward departure under § 4A1.3(b)(1), as Porcelli's offense level and criminal-history score would have been lower if the instant offense and the 2007 telemarketing offense had been consolidated for trial.

Porcelli objected, in relevant part, that the "loss and restitution" amount was incorrect and that he did not use a special skill or hold any fiduciary relationship with the clients. He further objected that the failure to consolidate the two fraud cases resulted in an overstated criminal history and that the probation officer did not adequately describe his cooperation in the telemarketing case.

At the first sentencing hearing, several victims testified that Porcelli had caused them emotional and physical distress by manipulating, intimidating, and confusing them into the agreements, then harassing and threatening them and stealing their homes after they defaulted. One victim experienced high blood pressure and a heart attack as a result of Porcelli's actions, another was seeing a psychologist and taking considerable medication, and a third attempted to commit suicide. At the second sentencing hearing, defense counsel indicated that Porcelli had offered to do "whatever is necessary to assist the people who still have liens against them," and he noted that he had received a substantial-assistance reduction to his sentence in the telemarketing case. The prosecutor and FTC officer in the

telemarketing case both had submitted emails to the court praising Porcelli's cooperation in that case.

The district court found a total loan amount of $1,886,500 and an estimated loss amount of $1,066,381.80. The court found that two victims erroneously appeared twice on the list in the PSI, but that there remained more than 50 victims of the offense within the meaning of the Guidelines.

Porcelli argued that the § 3B1.3 role enhancement should not apply, as his mortgage-lending license did not rise to the level of a "special skill" for purposes of § 3B1.3 and he did not hold a unique relationship of trust with the victims. He contended that he never held himself out as anything other than a lender. The court stated that it believed the § 3B1.3 enhancement to arise from an abuse of trust, rather than use of a special skill, and it noted that an abuse of trust occurs when a defendant falsely holds himself out as holding a position of public or private trust. It further found that the enhancement applied because Porcelli's status as a licensed mortgage lender was integral to his perpetration of the fraud.

The government stated that Porcelli's three criminal-history points had been properly assessed, but that it would be reasonable to apply a downward variance based on a finding that imposition of the three points was not fair. It acknowledged that the prosecutor in the telemarketing case had spoken

9

"glowingly" of Porcelli's assistance and that Porcelli had received a sentence reduction in that case. It further argued that the court should impose the instant sentence to run consecutively to the sentence in the telemarketing case, as the cases involved two separate frauds and an "enormous number" of victims for which Porcelli needed to be held accountable.

Porcelli argued that the two cases had not been consolidated only because of delays arising from prolonged plea-bargain discussions. He indicated that he had hoped that his cooperation in the Southern District of Illinois would be considered in both cases, but the unfortunate timing prevented that from happening. Furthermore, if the cases had been consolidated, the guideline calculations in this case likely would have absorbed by the other offense level due to the much greater size of the telemarketing case. He acknowledged that the Sentencing Guidelines did not require consecutive sentencing, but he argued that a sentencing credit or concurrent sentencing would be equitable. Furthermore, Porcelli readily acknowledged that his conduct was wrong, and he was attempting to "absolve himself of his sins" insofar as the mortgages were concerned.

Porcelli's wife submitted a written statement of support and his sister spoke on his behalf. Porcelli apologized directly to his family, the court, the government, and the victims, and he pledged to do whatever he could to make up

for his actions. He expressed his remorse for all of his criminal activity across the two cases and described his cooperation as an effort to "embark on the proper course." He asked the court for the opportunity to demonstrate his ability to become a productive citizen and a good family member again.

The court acknowledged the theory that Porcelli would have had no criminal-history points if the government had filed the instant indictment more promptly, but it found that the two frauds were separate, so it would not be reasonable to run the two sentences concurrently unless Porcelli's cooperation in the telemarketing case were applicable to the sentencing considerations in the instant case. The government responded that the cooperation dealt only with the unrelated telemarketing offense and, thus, did not meet the definition of substantial assistance in the instant case. It added that the Southern District of Illinois fully accounted for his cooperation when reducing the other sentence.

The government read a statement from one of the victims, and another victim addressed the court. As to the forfeiture issue, the government noted that $48,000 of the total loan amount had been lent to people who were not "victims" of the fraud. Therefore, the government requested a forfeiture money judgment of $1,838,500. Porcelli stated that he did not question the appropriateness of a forfeiture, but he contended that it should be based on the loss amount, not the

11

total loan amount. The difference between those two amounts was the substantial sum of money paid to third parties for the benefit of the victims, and, as such, it should not be subject to forfeiture. The court found that a forfeiture must be based on the gross proceeds traceable to the offense, not the net proceeds or the loss amount. Accordingly, the objection was overruled.

The court reiterated that Porcelli had a total offense level of 33 and 3 criminal-history points, for a criminal history category of II and a guideline range of 151 to 188 months' imprisonment. It found that applying the criminal-history points would not be fair under the circumstances, so it departed downward to criminal history category I and a guideline range of 135 to 168 months' imprisonment.[1] Regarding whether to run the sentence concurrently with the sentence for the telemarketing fraud, the court noted that the two frauds were separate schemes with entirely different victims, so there was no relevant conduct here that had been, or could have been, considered by the Southern District of Illinois sentencing judge. It found that Porcelli's cooperation in the telemarketing case was adequately reflected in the substantial-assistance reduction he received in that case, and that, furthermore, it could not give Porcelli credit for cooperation in

---

[1] The district court and the probation officer indicated that the reduced guideline range was 135 to 151 months' imprisonment, but the Sentencing Table in U.S.S.G. chapter 5 indicates that the correct range is 135 to 168 months' imprisonment.

12

the absence of a request by the government. It stated that it would impose the instant sentence to run consecutively to the Illinois sentence, out of fairness to the victims and in recognition of the fact that the cases involved separate frauds.

The court waived a fine. It stated that it had considered the advisory guidelines, all of the discussion during the hearing, and the 18 U.S.C. § 3553 sentencing factors. It noted in particular the needs for protection of the public, deterrence, and a sufficient but not greater-than-necessary sentence. It then imposed a below-guideline sentence of 120 months' imprisonment, consecutive to the Illinois sentence of 99 months' imprisonment, followed by 3 years' supervised release, to run concurrently with any supervision imposed in the Illinois case. The court also entered a forfeiture money judgment of $1,838,500. At a later restitution hearing, the court reviewed the mortgage satisfactions that Porcelli had filed in the interim and ordered $669,041.92 in restitution.

## II.

The § 3B1.3 enhancement applies "[i]f the defendant abused a position of public or private trust, or used a special skill, in a manner that significantly facilitated the commission or concealment of the offense." U.S.S.G. § 3B1.3. We review for clear error the district court's factual determination that a defendant abused a position of trust, but its conclusion that the defendant's conduct justified

13

the abuse-of-trust enhancement is a question of law that we review *de novo*.

*United States v. Garrison*, 133 F.3d 831, 837 (11th Cir. 1998).

The question of whether a defendant occupied a position of trust is assessed from the perspective of the victim of the crime. *Id.* In a fraud case, § 3B1.3 "has been recognized to apply in two situations: (1) where the defendant steals from his employer, using his position in the company to facilitate the offense, and (2) where a fiduciary or personal trust relationship exists with other entities, and the defendant takes advantage of the relationship to perpetrate or conceal the offense." *Id.* at 837-38 (quotation marks omitted). A "position of public or private trust is characterized by professional or managerial discretion . . . . Persons holding such positions ordinarily are subject to significantly less supervision than employees whose responsibilities are primarily non-discretionary in nature." § 3B1.3, comment. (n.1). The abuse-of-trust adjustment also applies if "the defendant provides sufficient indicia to the victim that the defendant legitimately holds a position of private or public trust when, in fact, the defendant does not," such as by falsely representing that he is a legitimate investment broker or licensed physician. *Id.*, comment. (n.3). In making such a misrepresentation, the defendant assumes a position of trust relative to the victim, thus providing himself the same

opportunity to commit a difficult-to-detect crime that he would have had if the position were held legitimately.  *Id.*

"[T]he primary concern of § 3B1.3 is to penalize defendants who take advantage of a *position* that provides them freedom to commit or conceal a difficult-to-detect wrong."  *Garrison*, 133 F.3d at 838 (quotation marks omitted). The court "must distinguish between those arms-length commercial relationships where trust is created by the defendant's personality or the victim's credulity, and relationships in which the victim's trust is based on [the] defendant's position in the transaction."  *Id.* (quotation marks omitted).  "Fraudulently inducing trust in an investor is not the same as abusing a bona fide relationship of trust with that investor."  *United States v. Mullens*, 65 F.3d 1560, 1567 (11th Cir. 1995).

Here, Porcelli falsely held out Safe Harbour as a nonprofit foundation dedicated to "foreclosure relief."  Victims contacted Porcelli in reliance on that representation, as well as on the misrepresentations that Safe Harbour was established to "keep [people] in [their] home[s]," "give [them] a second chance," "[s]ave [their] credit," and protect them from "predators" who wanted to profit from their misfortunes.  Porcelli then took advantage of the victims' belief that he was a nonprofit foreclosure-relief counselor in order to induce them to take out second mortgages through Silverstone Lending or another of his for-profit lenders.

Silverstone Lending's ability to make such mortgages and to create the attendant fees depended on Porcelli's state-issued mortgage-lending license. Under all the circumstances, the district court did not clearly err in finding that Porcelli held, or falsely led the victims to believe that he held, a bona fide relationship of trust with them. *See* § 3B1.3 & comment. (n.3); *Garrison*, 133 F.3d at 837.

Furthermore, Porcelli's interactions with the victims were not limited to "arms-length" lending transactions in which Porcelli, as a representative of Silverstone Lending, "[f]raudulently induc[ed] trust in" the borrowers. *See Garrison*, 133 F.3d at 838; *Mullens*, 65 F.3d at 1567. Rather, Porcelli also used his falsely assumed position as a nonprofit foreclosure-relief coordinator to manipulate and intimidate the victims into believing that a second mortgage from Silverstone Lending was their only remaining option, and, in doing so, caused the victims to be more susceptible to signing the exorbitant mortgage contracts. Thus, the court did not err in finding that Porcelli abused his falsely assumed position of trust with the victims. *See* § 3B1.3 & comment. (n.3); *Garrison*, 133 F.3d at 837-38; *Mullens*, 65 F.3d at 1567.

If a defendant is eligible for both the § 3B1.1 aggravated-role enhancement and the § 3B1.3 enhancement, the court may only apply both enhancements if the latter is based at least in part on an abuse of trust. *See* § 3B1.3. If the § 3B1.3

16

enhancement is based solely on the use of a special skill, it may not be applied in addition to the § 3B1.1 enhancement. *Id.* Here, the district court explicitly relied upon the abuse-of-trust provision, and, again, the enhancement is valid on that ground. Although the court did note that Porcelli's status as a licensed mortgage lender was integral to the fraud, it did not state that the § 3B1.3 enhancement was applicable solely due to a special skill associated with that license. Accordingly, the court did not err in applying both enhancements. *See* § 3B1.3.

## III.

Where, as here, the defendant fails to object in the district court to a purported guideline calculation error, we review for plain error. *See United States v. Massey*, 443 F.3d 814, 818 (11th Cir. 2006). Thus, Porcelli must show (1) an error that (2) is plain, (3) affects substantial rights, and (4) seriously affects the fairness, integrity, or public reputation of judicial proceedings. *United States v. Olano*, 507 U.S. 725, 732, 113 S.Ct. 1770, 1776, 123 L.Ed.2d 508 (1993). "The findings of fact of the sentencing court may be based on evidence heard during trial, facts admitted by a defendant's plea of guilty, undisputed statements in the presentence report, or evidence presented at the sentencing hearing." *United States v. Wilson*, 884 F.2d 1355, 1356 (11th Cir. 1989).

"If the defendant knew or should have known that a victim of the offense was a vulnerable victim," he is subject to a two-level enhancement. § 3A1.1(b)(1). A "vulnerable victim" is a victim "who is unusually vulnerable due to age, physical or mental condition, or who is otherwise particularly susceptible to the criminal conduct." *Id.*, comment. (n.2). The adjustment applies when the defendant selects his victim due to his perception of the victim's vulnerability to the offense. *United States v. Day*, 405 F.3d 1293, 1296 (11th Cir. 2005). Thus, in determining whether the victims were "vulnerable," we focus on the facts known to the defendant when he decided to target the victims, not on the harm actually suffered by the victims. *United States v. Page*, 69 F.3d 482, 489 & n.6 (11th Cir. 1995). "It is clear that having bad credit or otherwise being in a precarious financial situation is a 'vulnerability' to fraudulent financial solicitations . . . ." *Id.* When a fraudulent loan scheme is "specifically addressed . . . to persons with bad credit," it "target[s] the most desperate victims." *Id.* at 490. "We will not absolve . . . defendants of their culpability for having targeted 'vulnerable victims' simply because, in casting out their net, they happened to ensnare and defraud some individuals who did not share this vulnerability." *Id.* at 491-92.

Porcelli specifically targeted individuals who were financially distressed and were in danger of losing their homes through foreclosure. He marketed Safe

Harbour as a nonprofit organization that would "give people a second chance when no one else w[ould]," and he wrote the marketing materials to appeal to people who were facing "financial pressures," bankruptcy, harassment by creditors, and "ruin[ed] . . . credit ratings." Although Porcelli suggests that some or all of the victims might have lost their homes despite their involvement with him, the actual harm suffered is irrelevant to this analysis. *See Page*, 69 F.3d at 489 n.6. Furthermore, his speculation that some of the victims might not have been financially distressed or might have sought the mortgages for reasons other than imminent foreclosure does not prove that the vulnerable-victim finding was plainly erroneous. *See Massey*, 443 F.3d at 818; *Page*, 69 F.3d at 491-92. The district court did not plainly err in finding that the victims were unusually susceptible to the mortgage-fraud scheme, that Porcelli had targeted them for that reason, and, thus, that the vulnerable-victim enhancement applied. *See* § 3A1.1(b)(1) & comment. (n.2); *Massey*, 443 F.3d at 818; *Page*, 69 F.3d at 489-90.

IV.

Property is subject to forfeiture to the United States if it "constitutes or is derived from proceeds traceable to a violation of" certain enumerated offenses, including mail fraud. 18 U.S.C. § 1981(a)(1)(C), *cross-referencing* §§ 1957(c)(7), 1961(1). If a defendant is convicted of one of the enumerated offenses, the

19

sentencing court is required to order forfeiture of the property. 28 U.S.C. § 2461(c). A forfeiture order violates the Excessive Fines Clause "when it is grossly disproportional to the gravity of a defendant's offense." *United States v. Chaplin's, Inc.*, No. 10-10832, slip op. at 2469 (11th Cir. July 13, 2011) (quotation marks omitted). Thus, we review the forfeiture only for gross disproportionality, not for strict proportionality. *Id.* This standard acknowledges that "proportionality analyses are inherently imprecise and best kept within the province of legislatures, not courts." *Id.* (quotation marks omitted).

Three factors guide the gross-disproportionality inquiry: "(1) whether the defendant falls into the class of persons at whom the criminal statute was principally directed; (2) other penalties authorized by the legislature (or the Sentencing Commission); and (3) the harm caused by the defendant." *Id.* (quotation marks omitted). Additionally, "the interplay between the forfeiture order and the fine imposed by the district court" is relevant to the gross-disproportionality analysis. *Id.* at 2472. Finally, a strong presumption of constitutionality applies to forfeitures that fall below the maximum statutory fine for the offense. *Id.* at 2469. Yet where a forfeiture exceeds the statutory-maximum or guideline-range fine, it is not presumptively invalid. *See id.* Rather, such forfeitures simply receive closer scrutiny. *Id.*

20

The district court entered a forfeiture money judgment of $1,838,500, equal to the total amount lent to the victims, or the gross proceeds of the offense. Porcelli does not challenge the forfeiture of the estimated loss amount of $1,066,381.80. Rather, he challenges only the constitutionality of the forfeiture of the other $772,118.20, on grounds that the latter amount was used to pay off the first mortgages and, thus, benefitted the victims.

First, Porcelli appropriately does not suggest that he is outside the class of persons at whom the mail-fraud statute is principally directed. *See Chaplin's*, slip op. at 2469. Second, the available sentences—statutory maximum sentences of 20 years' imprisonment and a $250,000 fine—suggest that Porcelli was convicted of a serious offense. *See id.* at 2469-70. Third, Porcelli's offense involved well over 50 vulnerable victims, to whom he caused serious financial, physical, and mental harm, despite his use of part of the proceeds to pay the victims' first mortgages. *See id.* at 2469. Indeed, payment of the first mortgages was not a mere "benefit" provided to the victims but, rather, was an integral part of Porcelli's scheme to defraud the victims of the equity in their homes by positioning himself to foreclose on the second mortgages.

Fourth, Porcelli was subject to a statutory-maximum fine of $250,000 and a guideline range of $17,500 to $175,000, meaning that the challenged portion of

21

the forfeiture was approximately three times the statutory maximum and four-and-a-half times the high end of the guideline range. Yet the district court waived a fine entirely, and, furthermore, imposed both a downward departure and a downward variance to a term of imprisonment that was only half the maximum authorized by statute. Moreover, "Congress has authorized both a fine and forfeiture as part of the punishment for" a mail-fraud offense, "which suggests that Congress does not consider a punishment somewhat above the statutory fine range to be excessive." *See id.* at 2472. Taking all of these factors together, Porcelli has not shown that the forfeiture of the challenged $772,118.20 was grossly disproportional to the gravity of his offense. *See id.* at 2469, 2472.

V.

We review a sentence for substantive reasonableness under an abuse-of-discretion standard. *United States v. Irey*, 612 F.3d 1160, 1188 (11th Cir. 2010) (*en banc*), *cert. denied*, 131 S.Ct. 1813 (2011). We will reverse a sentence under that standard only if the district court has made a clear error of judgment. *Id.* at 1189. The appellant bears the burden of establishing that the sentence is unreasonable. *United States v. Talley*, 431 F.3d 784, 788 (11th Cir. 2005).

After *United States v. Booker*, 543 U.S. 220, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005), sentencing is a two-step process that requires the district court first to

"consult the Guidelines and correctly calculate the range provided by the Guidelines," then to consider the factors in 18 U.S.C. § 3553(a) and determine a reasonable sentence. *Talley*, 431 F.3d at 786. Those factors include: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (3) the need for deterrence; (4) the need to protect the public; (5) the need to provide the defendant with training or medical care; (6) the kinds of sentences available; (7) the sentencing guideline range; (8) pertinent policy statements of the Sentencing Commission; (9) the need to avoid unwarranted sentencing disparities; and (10) the need to provide restitution to the victims. *Id.* (discussing § 3553(a)).

"Multiple terms of imprisonment imposed at different times run consecutively unless the court orders that the terms are to run concurrently." 18 U.S.C. § 3584(a). Where, as here, the offenses underlying the two sentences did not arise from relevant conduct, the district court may impose the new sentence to run concurrently, partially concurrently, or consecutively to the undischarged term of imprisonment for the earlier offense. § 5G1.3(c). The court should aim "to achieve a reasonable incremental punishment for the instant offense and avoid unwarranted disparity" by considering the statutory sentencing factors, the length

23

of the undischarged sentence, the time already served and likely to be served on the undischarged sentence, "the fact that the prior undischarged sentence may have been imposed in state court . . . or at a different time before the same or different federal court," and any other circumstances relevant to determining an appropriate sentence. § 5G1.3, comment. (n.3(A)); *accord* § 3584(b) (requiring the court to consider the § 3553(a) factors in deciding whether to order concurrent or consecutive sentencing). The decision whether to impose consecutive or concurrent sentencing under § 5G1.3(c) is within the district court's discretion. *United States v. Bradford*, 277 F.3d 1311, 1317 (11th Cir. 2002).

Here, the district court heard argument about Porcelli's extensive cooperation in the Southern District of Illinois case, the missed possibility of trying the two cases together, and the effect of the delay on his criminal history and offense level. Porcelli expressed his remorse and pledged to do whatever he could to make up for his conduct, such as filing satisfactions of the outstanding mortgages. His wife and sister made statements on his behalf. The court also heard about the "enormous number" of victims across the two cases and the fact that Porcelli's cooperation did not pertain to the instant offense. A number of victims also made statements to the court about the financial, physical, and mental harm they suffered due to Porcelli's conduct.

The court considered all of the arguments and the § 3553(a) factors, noting in particular the issue with Porcelli's criminal history, the lack of relevant conduct that could have been considered by the Illinois judge, the reflection of Porcelli's cooperation in the reduced Illinois sentence, and the needs for fairness to the victims, deterrence, and protection of the public. It departed downward by 1 criminal history category and varied further downward to a sentence of 120 months' imprisonment, thus imposing a sentence 15 months below the new guideline range and 31 months below the original range, but determined that consecutive sentencing would be appropriate in order to reflect the different circumstances and victims of the two offenses. Porcelli has not shown that these decisions constituted a clear abuse of the court's discretion. *See* § 5G1.3, comment. (n.3(A)); *Irey*, 612 F.3d at 1188-89; *Bradford*, 277 F.3d at 1317.

For the foregoing reasons, we affirm Porcelli's sentence.

**AFFIRMED.**